**STICHTING PENSIOENFONDS VOOR DE GEZONDHEID, GEESTELIJKE EN MAATSCHAPPELIJKE BELANGEN, Appellant**

v.

**UNITED STATES of America, Appellee**

**No. 97–5006.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 29, 1997.

Decided Nov. 14, 1997.

---

K. Peter Schmidt, Washington, DC, argued the cause for appellant. With him on the briefs was Philip W. Horton.

Robert W. Metzler, Washington, DC, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the briefs were Mary Lou Leary, Acting U.S. Attorney at the time the brief was filed, Loretta C. Argrett, Assistant Attorney General, U.S. Department of Justice, and Kenneth L. Greene, Attorney.

Before: EDWARDS, Chief Judge, GINSBURG and TATEL, Circuit Judges.

TATEL, Circuit Judge:

A Dutch pension fund jointly controlled by employers and unions and claiming to be a "labor organization" as described in section 501(c)(5) of the Internal Revenue Code challenges the Internal Revenue Service's denial of its application for exemption from federal income taxation. Because tax exemptions require unambiguous proof and because we can find no authority directly entitling the pension fund to an exemption, we affirm the

district court's grant of summary judgment to the United States.

## I

Appellant Stichting Pensioenfonds Voor de Gezondheid, Geestelijke en Maatschappelijke Belangen (the "Fund") is a Dutch pension plan formed in 1969 following negotiations between labor unions representing hospital workers and the Dutch national hospital employers' association. Soon after the Fund's formation, the Dutch government granted it "compulsory treatment," thus requiring all private hospitals and their employees to participate. The Fund has since expanded to include fourteen health and social welfare sectors in the Netherlands. The Fund has no principal place of business in the United States, nor does it engage in any trade or business here.

A board of directors controls the Fund's management and assets. Pursuant to Dutch law, employers and unions each appoint half of the board's twelve directors. The six employer directors and the six union directors enjoy equal voting power. If all directors are not present at a meeting, each side may only cast as many votes as the side with the fewer directors. On all policy issues, employer and union directors must agree, or the board may not act. Unions and employers also designate equal numbers of directors to all committees formed by the board.

As the second largest private pension fund in the Netherlands, the Fund covered approximately one million people as of December 31, 1993, some of whom were union members and some of whom were not. About 600,000 were active contributing members. Some 330,000 of the remaining members were "sleepers," a Dutch idiom referring to employees no longer working in industry sectors covered by the Fund but entitled to receive pension benefits upon retirement by virtue of previous employment. The remaining members were retirees already receiving pension benefits.

Both employers and employees contribute to the Fund. The board of directors establishes required contribution rates, as well as the respective portions of the total contribution paid by employers and employees.

The Fund invests in U.S. stocks and mutual funds. In 1993, its U.S. security custodians withheld and paid to the U.S. Treasury over eight million dollars in income tax. Claiming tax-exempt status as a labor organization under section 501(c)(5) of the Internal Revenue Code, see 26 U.S.C. § 501(c)(5) (1994), the Fund filed a claim for this amount. Receiving no response from the Service, the Fund filed suit in the U.S. District Court for the District of Columbia.

Noting that taxpayers must prove exemptions "unambiguously," and finding that the Fund lacked "a sufficient nexus with a more traditional labor organization to qualify as a tax-exempt labor organization itself," the district court granted summary judgment for the United States. *Stichting Pensioenfonds Voor De Gezondheid, Geestelijke En Maatschappelijke Belangen v. United States*, 950 F.Supp. 373, 374, 379 (D.D.C.1996). In doing so, the district court rejected the Fund's alternative argument that, even if not entitled to tax-exempt status, it should have received a refund pursuant to section 7805(b) of the Code, 26 U.S.C. § 7805(b) (1994) (superceded by 28 U.S.C.A. § 7805(b)(8) (West Supp.1997)). *Stichting Pensioenfonds*, 950 F.Supp. at 381. We review the district court's grant of summary judgment *de novo. Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir. 1994).

## II

Because the Constitution confers upon Congress exclusive authority to collect taxes to provide for the general welfare of the United States, U.S. CONST. art. I, § 8, cl. 1, only Congress itself may create exemptions from federal tax laws. Given the importance of taxation and the general presumption in favor of taxing all sources of income, courts may not infer exemptions when Congress has not clearly provided for them. *See* 1 JACOB MERTENS, JR., THE LAW OF FEDERAL INCOME TAXATION § 3.49 (NOV. 1991). For this reason, the Supreme Court has consistently held for over a century that a taxpayer must "unambiguously" prove entitlement to an exemption: "[E]xemptions

from taxation are not to be implied; they must be unambiguously proved," *United States v. Wells Fargo Bank,* 485 U.S. 351, 354, 108 S.Ct. 1179, 1182, 99 L.Ed.2d 368 (1988); "[T]hose who seek an exemption from a tax must rest it on more than a doubt or ambiguity. Exemptions from taxation cannot rest upon mere implications," *United States v. Stewart,* 311 U.S. 60, 71, 61 S.Ct. 102, 109, 85 L.Ed. 40 (1940); "As taxation is the rule, and exemption the exception, the intention to create an exemption must be expressed in clear and unambiguous terms.... Legislation which relieves any species of property from its due proportion of the burdens of the government must be so clear that there can be neither reasonable doubt nor controversy in regard to its meaning," *Yazoo & Miss. Valley R.R. Co. v. Thomas,* 132 U.S. 174, 183, 10 S.Ct. 68, 72, 33 L.Ed. 302 (1889). As Justice Cardozo said for a unanimous court over sixty years ago, "Exemptions from taxation are not to be enlarged by implication if doubts are nicely balanced." *Trotter v. Tennessee,* 290 U.S. 354, 356, 54 S.Ct. 138, 139, 78 L.Ed. 358 (1933). With this extremely high standard in mind, we search for some direct authority that unquestionably and conclusively entitles the Fund to the exemption it seeks.

■ We begin, of course, with the Internal Revenue Code. Section 501(c)(5) exempts labor, agricultural, and horticultural organizations from taxation. 26 U.S.C. § 501(c)(5). The Code neither defines the term "labor organization" nor elaborates on its meaning. The legislative history, moreover, provides no unambiguous guidance. The early twentieth-century congressional debates on whether to include the term "labor organization" in section 501(c)'s precursor had nothing to do with whether jointly controlled entities providing pension benefits should be exempt from federal taxation. Instead, the debates focused on whether the Code's exemption for "fraternal beneficiary societies ... providing for the payment of life, sick, accident, or other benefits to members" would be understood as covering all labor organizations, a question that Congress answered negatively when it explicitly exempted labor organizations. *See* 44 CONG. REC. 4154–55 (1909). We agree with the district court that this

legislative history provides "little help" in understanding the scope of the term "labor organization." *See Stichting Pensioenfonds,* 950 F.Supp. at 375.

We next turn to the Treasury Regulation that defines the term "labor organization," but which is ultimately unhelpful. It says:

> The organizations contemplated by section 501(c)(5) as entitled to exemption from income taxation are those which:
>
> (1) Have no net earnings inuring to the benefit of any member, and
>
> (2) Have as their objects the betterment of the conditions of those engaged in such pursuits, the improvement of the grade of their products, and the development of a higher degree of efficiency in their respective occupations.

26 C.F.R. § 1.501(c)(5)–1(a) (1997). A nonprofit entity, the Fund clearly satisfies sub-paragraph (1). While the Fund may also satisfy the first of sub-paragraph (2)'s requirements—it has as its object the betterment of employee financial conditions—it cannot meet the other two requirements: it works neither to improve products nor to develop higher degrees of efficiency. The Fund urges us to read subparagraph (2) disjunctively, but given the plain meaning of the word "and" we cannot do so. *See* C.K. OGDEN, BASIC ENGLISH INTERNATIONAL SECOND LANGUAGE 132 (1968) ("*And* is used for joining words together: *The man and the woman are married. Or* is used for the idea of one of two: *The man or the woman is married.*"). Although this conclusion would otherwise end this case—the regulation does not unambiguously entitle the Fund to an exemption—the Service did not rely on the regulation in its brief or at oral argument. Because the Service itself does not argue that the regulation excludes the Fund from labor organization status, we decline to decide the case on that basis.

Finding help in neither the Code nor the regulation, we look next to the IRS's Revenue Rulings, the second most important agency pronouncements that interpret the Code. Applying the Code to specific situations, Revenue Rulings bind both the Service and the taxpayer. Although Revenue Rul-

ings "do not have the force and effect of Treasury Department Regulations," they are "published to provide precedents to be used in the disposition of other cases, and may be cited and relied upon for that purpose." 26 C.F.R. § 601.601(d)(2)(v)(*d*) (1997). But because "each Revenue Ruling represents the conclusion of the Service as to the application of the law to the entire state of facts involved, taxpayers, Service personnel, and others concerned are cautioned against reaching the same conclusion in other cases unless the facts and circumstances are substantially the same." 26 C.F.R. § 601.601(d)(2)(v)(*e*). The Fund can thus prevail only by identifying a Revenue Ruling awarding an exemption in a case having facts and circumstances "substantially the same" as this case. Examining the relevant Revenue Rulings carefully, we find no such controlling authority.

The Service has issued fifteen Revenue Rulings under section 501(c)(5). *See Stichting Pensioenfonds,* 950 F.Supp. at 378 nn.2–3 (citing the Rulings). Eleven deal with organizations completely controlled by unions and thus do not involve facts and circumstances substantially similar to those in this case. Of the four that concern jointly controlled organizations, three award tax exemptions, but none of the organizations covered by those rulings is substantially similar to the Fund. *See* Rev. Rul. 78–42, 1978–1 C.B. 158; Rev. Rul 75–473, 1975–2 C.B. 213; Rev. Rul. 59–6, 1959–1 C.B. 121. To begin with, the organizations do not provide pension benefits. Rulings 78–42 and 59–6 deal with apprenticeship committees that provide training and education to employees, while Ruling 75–473 involves a jointly controlled dispatch hall that allocates work assignments to union members and adjudicates grievances over working conditions. Moreover, the labor organizations that the Service found exempt in these three rulings focus primarily on improving employee conditions *on the job,* while the Fund has as its purpose improving employee benefits *after the job,* i.e. pension benefits. The three Rulings also differ from this case because none involves organizations governed by foreign law. Simply because the Service has awarded tax exemptions to labor organizations dually controlled under American law does not mean that it would necessarily have to reach the same conclusion for organizations dually controlled under foreign law, particularly since exempting foreign pension plans means that their earnings will escape all U.S. taxation. Earnings of exempt domestic funds, by comparison, are taxed when benefits are paid to recipients.

The Fund argues that it should receive an exemption because it conducts appropriate labor organization activities. That an organization performs activities "appropriate" to labor organizations, however, does not make it a labor organization under these Revenue Rulings. The Service has said only that a labor organization not itself a labor union that engages in appropriate labor union activities "may" qualify for an exemption. Rev. Rul. 75–473. The Service does not end its inquiry upon finding that the organization carries out an "appropriate" union activity. Instead, the Service examines the specific facts of each case, looking to other factors such as the organization's purpose, *see* Rev. Rul. 78–42; Rev. Rul. 59–6, and the nexus between the organization's activities and the parent labor union's objectives, *see* Rev. Rul. 75–473. Although providing and administering pension plans for workers is certainly an appropriate and traditional union function, we find no basis for an exemption in this case because the Revenue Rulings do not unambiguously stand for the proposition that any organization bearing some connection to a traditional labor union and performing appropriate or traditional union functions is necessarily an exempt labor organization.

The fourth Revenue Ruling dealing with a jointly controlled labor organization casts even more doubt on the Fund's claim. Rev. Rul. 77–46, 1977–1 C.B. 147. In that Ruling, the Service denied an exemption to an organization that withheld money from union members' pay and invested it, later paying it back annually with interest. Although the Fund argues, perhaps correctly, that this kind of savings plan differs from a pension plan, the Fund's claim for an exemption still ultimately rests on inference and implication rather than unambiguous authority.

■ The Fund also relies heavily on several General Counsel Memoranda. These "GCMs," however, have no precedential value. *See Disabled American Veterans v. Commissioner*, 942 F.2d 309, 315 n. 5 (6th Cir.1991) (rejecting reliance on GCMs on the grounds that "[s]uch informal, unpublished opinions of attorneys within the IRS are of no precedential value"); *Old Harbor Native Corp. v. Commissioner*, 104 T.C. 191, 206–07, 1995 WL 35310 (1995) ("[A] general counsel memorandum is not binding precedent on this Court."). They therefore cannot provide a basis for the Fund's claim.

The Fund has failed to meet its heavy burden of demonstrating unambiguous entitlement to tax-exempt status. We find nothing in the Code, the regulation, or the Revenue Rulings that even comes close to stating that a jointly controlled pension plan governed by foreign law is a labor organization exempt from federal taxation. Our doubts about the Fund's entitlement to tax-exempt status are not even "nicely balanced."

We recognize that in *Morganbesser v. United States*, 984 F.2d 560 (2d Cir.1993), the Second Circuit, with one judge dissenting, held that a jointly controlled pension fund is entitled to tax-exempt status under section 501(c)(5). Unlike this case, however, *Morganbesser* involved a pension fund organized under U.S. law. The Second Circuit, moreover, relied on the precedentially dubious GCMs, never mentioning or applying the "unambiguous" standard that we find controlling. In any event, the Treasury Department has now promulgated a regulation providing that "[a]n organization is not an organization described in section 501(c)(5) if the principal activity of the organization is to receive, hold, invest, disburse, or otherwise manage funds associated with ... pension or other retirement savings plans or programs." 62 Fed.Reg. 40,447, 40,449 (1997) (adding proposed 26 C.F.R. § 1.501(c)(5)–1(b)(1)). Although both parties agree that this purely prospective regulation has no relevance to the case before us, we mention it to point out that *Morganbesser* had a brief life.

## III

■ We turn finally to the Fund's argument that even if not entitled to an exemption under section 501(c)(5), it should have received a refund pursuant to section 7805(b) of the Code, which gives the Service discretion to apply its rulings retroactively. *See* 26 U.S.C. § 7805(b). The Fund cites *IBM v. United States*, 170 Ct.Cl. 357, 343 F.2d 914 (1965). After the Service granted Remington Rand, a direct IBM competitor, an excise tax exemption for its Univac computers, IBM applied for a similar ruling for its competing computer. Several years later, the Service denied IBM's request, at the same time revoking Remington's exemption. Invoking section 7805(b), the court held that the Service had abused its discretion by taxing IBM but not Remington in the years prior to the revocation of Remington's exemption. *Id.* 343 F.2d at 923. Relying on this decision, the Fund argues that because the Service has exempted two similarly situated British pension funds in private determination letters, it likewise abused its discretion by failing to give the Fund a refund for the period in question, i.e.1993. We disagree.

To begin with, *IBM* applies only to direct competitors. In its very first sentence, the court stressed the competitive relationship between IBM and Remington Rand: "International Business Machines Corporation ... and Remington Rand were, in the years 1951–1958, the two competitors in the manufacture, sale, and leasing of larger electronic computing systems." *Id.* at 915–16. Treating direct competitors similarly for tax purposes, the court emphasized, "is peculiarly essential to free and fair competition," *id.* at 923; *see also id.* at 921 n. 8 (noting that IBM and Remington "were the only two competitors as to the type of devices involved in the Service's rulings"); *id.* at 923 (indicating that the Service's treatment "favor[ed] the other competitor so sharply that fairness called upon the Commissioner ... to establish a greater measure of equality"). In view of this language, courts interpreting *IBM* have limited it to cases involving direct competitors. *See, e.g., Wilson v. United States*, 588 F.2d 1168, 1172 (6th Cir.1978) (characterizing *IBM* as applying to Service regulations or

rulings that "would lead to inequality of treatment between competitor taxpayers"); *Anderson, Clayton & Co. v. United States,* 562 F.2d 972, 981 (5th Cir.1977) (same). Because the Fund does not allege—as of course it could not—that it competes with the two exempt British funds, *IBM* has no applicability to this case.

We also doubt that section 7805 even applies here. By its terms, section 7805 only applies to a decision by the Service to limit the retroactive effect of a ruling. Here, the Service has simply denied a refund, taking no action whatsoever with respect to retroactivity. Moreover, neither the plain language of section 7805 nor any of the cases that the Fund cites stands for the proposition that once the Service has treated one taxpayer a certain way, it must thereafter treat every similarly situated taxpayer exactly the same way. In fact, to the extent that Treasury's new regulation denying section 501(c)(5) tax-exempt status to pension funds, *supra* at 200, represents a repudiation of the Service's previous decision to exempt the British funds, nothing requires the Service to perpetuate its original error by granting the same mistaken exemption to other taxpayers. *See Sirbo Holdings, Inc. v. Commissioner of Internal Revenue,* 509 F.2d 1220, 1222 (2d Cir. 1975) ("While even-handed treatment should be the Commissioner's goal ... [t]he making of an error in one case, if error it was, gives other taxpayers no right to its perpetuation.").

We affirm the district court's grant of summary judgment for the United States.

*So ordered.*