09-1955-ag
Nathel v. Commissioner

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2009

(Argued:  February 3, 2010          Decided:  June 2, 2010)

Docket No. 09-1955-ag
_____

IRA NATHEL, TRACY NATHEL, SHELDON NATHEL, ANN M. NATHEL,

Petitioners-Appellants,

—v.—

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

Before: KATZMANN and RAGGI, Circuit Judges, and KOELTL, District Judge.[*]

_____

The petitioners appeal a decision of the United States Tax Court (Stephen J. Swift, Judge) finding that capital contributions they made to two S corporations could not be treated as "tax-exempt income" to the corporations for the purpose of increasing, pursuant to 26 U.S.C. § 1367(b)(2)(B), the petitioners' bases in loans they made to the corporations. The Tax Court also found that the petitioners could not deduct

_____

[*] The Honorable John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

their capital contributions as ordinary losses incurred in a trade or business pursuant to 26 U.S.C. § 165(c)(1) or incurred in a transaction entered into for profit pursuant to § 165(c)(2).  We affirm.

_____

HUGH JANOW, Pearl River, NY, for Petitioners-Appellants.

TERESA T. MILTON, Attorney (John A. DiCicco, Acting Assistant Attorney General, Steven Parks, Attorney, on the brief), Tax Division, United States Department of Justice, Washington, DC, for Respondent-Appellee.

_____

JOHN G. KOELTL, District Judge:

The petitioners, Ira and Tracy Nathel and Sheldon and Ann M. Nathel, appeal a decision of the United States Tax Court (Stephen J. Swift, Judge) upholding tax deficiencies assessed by the Commissioner of Internal Revenue (the "Commissioner"). On appeal, the petitioners argue that certain capital contributions they made to two S corporations, of which they were shareholders, should be treated as items of "tax-exempt income" to the corporations for the purpose of restoring, pursuant to 26 U.S.C. § 1367(b)(2)(B), the petitioners' previously reduced bases in loans they made to the corporations. The petitioners contend that as a result of their restored bases, they received no ordinary income when the S corporations repaid the petitioners' loans. Alternatively, the petitioners argue that because they made the capital contributions to obtain releases from personal loan guarantees made to one of the corporations, the capital contributions should be deductible as ordinary losses incurred in a transaction entered into for profit pursuant to 26 U.S.C. § 165(c)(2).

We conclude that the petitioners' capital contributions do not constitute "tax-exempt income" to the S corporations and, therefore, that the petitioners are not entitled to increase their bases in their loans. We also conclude that

-3-

because the petitioners have not met their burden of showing that the primary purpose of their capital contributions was to obtain releases from their loan guarantees, the petitioners are not entitled to deductions from ordinary income pursuant to § 165(c)(2).  Therefore, we affirm the Tax Court's decision.

**BACKGROUND**

The following facts are based on stipulated facts that the parties submitted to the Tax Court.

Ira and Sheldon Nathel[1] (the "Nathels") are brothers who, along with Gary Wishnatzki, organized three corporations that elected to be taxed under Subchapter S of the Internal Revenue Code (the "Code"), 26 U.S.C. §§ 1361–1379.  "Subchapter S allows shareholders of qualified corporations to elect a 'pass-through' taxation system under which income is subjected to only one level of taxation."  Gitlitz v. Comm'r, 531 U.S. 206, 209 (2001) (citing Bufferd v. Comm'r, 506 U.S. 523, 525 (1993)).  S corporation profits are not taxed on the corporate level; instead, they are passed through as taxable income to shareholders on a pro rata basis.  26 U.S.C. § 1366(a)(1)(A); see also Gitlitz, 531 U.S. at 209.

In addition to profits, an S corporation shareholder is also taxed on any gain from the shareholder's sale of

---

[1] Ira and Sheldon Nathel filed joint tax returns with their wives, who are also petitioners in this case.

S corporation stock, which gain is calculated as the amount realized from the sale in excess of the shareholder's basis in the stock. See 26 U.S.C. § 1001(a); Craven v. United States, 215 F.3d 1201, 1204 (11th Cir. 2000). A shareholder's basis in stock is generally the price paid for the stock if purchased from a third party or the amount of the shareholder's capital contributions if the stock is received in exchange for capital contributions. 26 U.S.C. § 1012; Treas. Reg. § 1.118-1 (1960).

Because S corporation profits are passed on to shareholders to be taxed at the individual level, to avoid the double taxation of a corporation's profits, the Code permits shareholders to increase their bases in a corporation's stock when the corporation receives certain "items of income described" in § 1366(a)(1)(A). § 1367(a)(1)(A); Gitlitz, 531 U.S. at 209. Similarly, any losses or deductions that are passed through from an S corporation to shareholders reduce the shareholders' bases in stock in order to prevent the double deduction of those items. § 1367(a)(2)(B); Gitlitz, 531 U.S. at 209. If the deductions passed through by the corporation to a shareholder exceed a given shareholder's remaining basis in stock in any tax year, the excess deductions are applied to reduce the shareholder's basis in any indebtedness owed by the S corporation to the

-5-

shareholder.[2]  § 1367(b)(2)(A).  If the shareholder's basis in indebtedness was so reduced, any net increase in basis in a subsequent tax year, as determined pursuant to §§ 1367(a)(1)(A) and 1366(a)(1)(A), is first applied to restore the shareholder's basis in indebtedness before it is applied to restore the shareholder's basis in stock. § 1367(b)(2)(B).

The three S corporations in this case, Wishnatzki & Nathel, Inc. ("W & N New York"), G & D Farms, Inc. ("G & D Farms"), and Wishnatzki & Nathel of California, Inc. ("W & N California"), were organized to operate food distribution businesses in New York, Florida, and California.  The Nathels each owned twenty-five percent of the corporations and Mr. Wishnatzki owned fifty percent.

In June 1999, the Nathels and Mr. Wishnatzki personally guaranteed $2.5 million in loans made by two banks to G & D Farms.  In December 2000, Ira and Sheldon Nathel each made personal loans in the amount of $649,775 to G & D Farms. As of December 31, 2000, the Nathels each had a zero basis in their G & D Farms and W & N California stock.  They each had a

---

[2] An S corporation shareholder typically would not be entitled to a deduction upon making a loan to an S corporation and would not include in income any repayment of the principal by the corporation to the extent it is less than or equal to the shareholder's basis in the loan.  See Nat'l Bank of Commerce of Seattle v. Comm'r, 115 F.2d 875, 876 (9th Cir. 1940) (finding that repayment of money lent is not income).  The shareholder's basis in the loan would equal the amount of the original principal, subject to any subsequent adjustments to basis.  See § 1012; § 1366(d)(1)(B).

basis of $112,547 in loans they made to G & D Farms and a basis of $3,603 in loans made to W & N California.

In February 2001, G & D Farms repaid the Nathels' December 2000 personal loans in the full amount of $649,775 each. In August 2001, the Nathels and Mr. Wishnatzki agreed to a plan to liquidate W & N California and to convey full ownership of G & D Farms to Mr. Wishnatzki and full ownership of W & N New York to the Nathels. Prior to its liquidation, W & N California repaid outstanding loans to the Nathels in the amount of $161,250 each. The Nathels then made capital contributions to W & N California in the amount of $181,396 each. The Nathels also made capital contributions to G & D Farms in the amount of $537,228 each. In the parties' stipulation before the Tax Court, they indicated that the capital contributions to G & D Farms "were made by the Nathels to secure the release of their respective guarantees of [G & D Farms'] debts to the Banks and to obtain [Mr. Wishnatzki's] agreement to the release of the Nathels from their guarantees and to the reorganization plan." (Stipulation of Facts ("Stip.") ¶ 34.) The parties also stipulated that "[a]s a condition for releasing Sheldon and Ira from their guarantees of [G & D Farms'] debt, the Banks and [Mr. Wishnatzki] required Sheldon and Ira to each contribute to [G & D Farms] additional capital in the amount of $537,228.00." (Stip.

-7-

¶ 26.) In sum, in 2001, the Nathels received a combined $1,622,050 in loan repayments from the two corporations and made a combined total of $1,437,248 in capital contributions.

In calculating their 2001 taxes, the Nathels treated their capital contributions to G & D Farms and W & N California as constituting "tax-exempt income" to the corporations for the purposes of § 1366(a)(1)(A). Therefore, because the Nathels' bases in their stock previously had been reduced to zero and because their bases in the loans they made to the corporations were also reduced, the Nathels used their capital contributions to restore their bases in the loans pursuant to § 1367(b)(2)(B). Without such an increase in their bases, the petitioners would have been taxed on the ordinary income that would have resulted from the corporations' repayment of the petitioners' loans in amounts above the petitioners' previously reduced bases.

The Commissioner rejected the Nathels' treatment of the capital contributions. The Commissioner determined that the Nathels' capital contributions could not be used to offset the ordinary income that resulted from the amount of the corporations' repayment of the Nathels' loans above the Nathels' then-existing bases in the loans. Instead, the Commissioner determined that the capital contributions increased the petitioners' bases in their G & D Farms and

-8-

W & N California stock. Because the petitioners redeemed their stock as part of the reorganization plan, the Commissioner determined that they were entitled to a long-term capital loss in light of their now-increased bases in the stock. The net effect of the Commissioner's calculation was an increase in the tax owed by the Nathels in 2001.

The Commissioner mailed a notice of deficiency dated June 21, 2006, to Ira and Tracy Nathel, indicating that they owed an additional $279,847 in income taxes for 2001. The Commissioner also mailed a notice of deficiency dated June 21, 2006, to Sheldon and Ann M. Nathel, indicating that they owed an additional $279,722. Both couples filed a timely petition in the Tax Court for a redetermination of the deficiencies. The Tax Court granted the parties' joint motion to consolidate the cases. In an opinion dated December 17, 2008, the Tax Court rejected the petitioners' challenges to the deficiencies determined by the Commissioner.[3] Nathel v. Comm'r, 131 T.C. 262 (2008).

---

[3] In addition to the arguments raised on appeal, the petitioners argued in the Tax Court that their capital contributions were deductible as ordinary losses incurred in a trade or business pursuant to § 165(c)(1). The Tax Court rejected that argument and the petitioners have abandoned it on appeal.

**DISCUSSION**

I

We accept the stipulated facts the parties submitted to the Tax Court. We review the Tax Court's legal conclusions de novo. Reimels v. Comm'r, 436 F.3d 344, 346 (2d Cir. 2006).

II

The petitioners' argument that their capital contributions can be used to increase the bases of their loans to the corporations begins with the Code. Section 1367(b)(2)(B) allows taxpayers to restore any basis in indebtedness that was reduced in a prior tax year if there is any "net increase" in basis in a subsequent tax year pursuant to § 1367(a)(1)(A). Section 1367(a)(1)(A), in turn, provides that a shareholder's basis is increased by a corporation's receipt of "the items of income described in" § 1366(a)(1)(A). Section 1366(a)(1)(A) provides that a shareholder's pro rata share of a corporation's "items of income (including tax-exempt income)," among other things, should be taken into account in calculating an S corporation shareholder's tax.

The petitioners make the novel argument that capital contributions constitute "items of income (including tax-exempt income)" for the purposes of § 1366(a)(1)(A). They make this argument despite 26 U.S.C. § 118(a), which provides that "[i]n the case of a corporation, gross income does not

-10-

include any contribution to the capital of the taxpayer." They argue that capital contributions are income, although tax-exempt income.

We are aware of no case that has decided whether capital contributions constitute "items of income (including tax-exempt income)" for the purposes of § 1366(a)(1)(A). However, while the question whether "income" in § 1366(a)(1)(A) includes capital contributions has not been resolved, courts frequently have addressed the scope of "income" as used in 26 U.S.C. § 61(a) and in the Sixteenth Amendment.[4] Those cases indicate that capital contributions traditionally are not considered to be "income" and, therefore, should not be considered "items of income" under § 1366(a)(1)(A).

In determining whether capital contributions constitute "items of income (including tax-exempt income)," we look first

---

[4] Section 61(a) of the Code states: "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived . . . ."

The Sixteenth Amendment allows Congress to "lay and collect Taxes on incomes, from whatever source derived, without apportionment among the several States." See also U.S. Const. art. I, § 2, cl. 3 ("[D]irect Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers . . . ."); U.S. Const. art. I, § 9, cl. 4 ("No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken.").

It should be noted that "gross income" in § 61(a) is at least as broad as the meaning of "incomes" in the Sixteenth Amendment. See Murphy v. IRS, 493 F.3d 170, 176, 178-79 (D.C. Cir. 2007). The petitioners have not suggested that the definition of "income" for purposes of § 1366(a)(1)(A) should be broader than the meaning of "incomes" under the Sixteenth Amendment, and we therefore find cases interpreting both "income" under § 61(a) and "incomes" under the Sixteenth Amendment to be instructive.

to the traditional distinction between income and capital. In *Eisner v. Macomber*, 252 U.S. 189, 219 (1920), the Supreme Court determined that a shareholder's receipt of a stock distribution was not income to the shareholder and, therefore, Congress's attempt to tax the stock dividend was not authorized by the Sixteenth Amendment. Rejecting the argument that the shareholder could be taxed on the corporation's underlying accumulated profits,[5] the Court stated that "enrichment through increase in value of capital investment is not income in any proper meaning of the term." Id. at 214-15. The Court drew a clear distinction between income and capital, defining income as "the gain derived from capital, from labor, or from both combined." Id. at 207 (internal quotation marks omitted).

Consistent with this definition, in *Edwards v. Cuba Railroad Co.*, 268 U.S. 628, 632-33 (1925), the Supreme Court found that subsidy payments from the Cuban government to the defendant railroad company were reimbursements for "capital expenditures" and were not profits or gains to the corporation, and, therefore, were not income for purposes of the Sixteenth Amendment. An early case by this Court

_____

[5] The Court noted that a shareholder's share of a corporation's accumulated profits could be taxed, but such taxation would be the taxation of property because of ownership, not income, and would require apportionment under Article I, section 2, clause 3 and Article I, section 9, clause 4 of the Constitution. Macomber, 252 U.S. at 217; see also n. 4, supra.

similarly distinguished income from capital. In United States v. Oregon-Washington Railroad & Navigation Co., 251 F. 211, 213 (2d Cir. 1918), Judge Learned Hand noted that the Code's use of "income" "unquestionably imports . . . the current distinction between what is commonly treated as the increase or increment from the exercise of some economically productive power . . . and the power itself."[6] Judge Hand stated that "income" "should not include such wealth as is honestly appropriated to what would customarily be regarded as the capital of the corporation taxed." Id.

Macomber's limited definition of income was expanded in United States v. Kirby Lumber Co., 284 U.S. 1, 3 (1931) (finding that discharge of indebtedness caused the corporation taxpayer to realize an "accession to income" and was taxable under the Code). Subsequently, in Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955), the Supreme Court adopted a broad definition of income as "instances of undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." In Glenshaw Glass, the Supreme Court held that a punitive damages award was taxable

---

[6] Oregon-Washington's holding, that discharge of indebtedness that was "a means of contribution to [the corporation's] capital account" did not constitute taxable income to the corporation, Oregon-Washington, 251 F. at 213, was later abrogated by 26 U.S.C. § 108(e)(6), which provides a mechanism for taxing discharge of indebtedness that was acquired by a corporation from a shareholder as a capital contribution. We address the petitioners' argument that § 108(e)(6) demonstrates that capital contributions constitute "items of income" for the purposes of § 1366(a)(1)(A) below.

because it was included in the definition of "gross income" under the Code.  Id. at 432-33.  The Court found that through its then-existing definition of gross income as "income derived from any source whatever," Congress intended "to exert in this field 'the full measure of its taxing power'" and thus to tax "all gains except those specifically exempted" by the Code.  Id. at 429-30 (quoting Helvering v. Clifford, 309 U.S. 331, 334 (1940)); see also Collins v. Comm'r, 3 F.3d 625, 630 (2d Cir. 1993).  The Court distinguished the narrow definition of income in Macomber, but in doing so, it was careful to maintain the distinction between capital and income:

> Nor can we accept respondents' contention that a narrower reading of [the predecessor of § 61(a)] is required by the Court's characterization of income in [Macomber], as "the gain derived from capital, from labor, or from both combined."  The Court was there endeavoring to determine whether the distribution of a corporate stock dividend constituted a realized gain to the shareholder, or changed 'only the form, not the essence,' of his capital investment.  It was held that the taxpayer had 'received nothing out of the company's assets for his separate use and benefit.'  The distribution, therefore, was held not a taxable event.  In that context— distinguishing gain from capital—the definition served a useful purpose.  But it was not meant to provide a touchstone to all future gross income questions.

Glenshaw Glass, 348 U.S. at 430-31 (emphasis added) (citations omitted).

-14-

Congress has specifically recognized that capital contributions are not income. In 1954, Congress enacted § 118(a) of the Code, which provides that, "[i]n the case of a corporation, gross income does not include any contribution to the capital of the taxpayer." Internal Revenue Code of 1954, Pub. L. No. 83-591, ch. 736, § 118(a), 68A Stat. 3, 39. The legislative history of § 118(a) indicates that the purpose of that section was to codify pre-1954 court decisions holding that certain payments to corporations by nonshareholders should be treated as capital contributions and not as income to the corporations, just as shareholder contributions were not treated as income to the corporations. See H.R. Rep. No. 83-1337, at 17 (1954), reprinted in 1954 U.S.C.C.A.N. 4017, 4042 (noting that § 118(a) "in effect places in the [C]ode the court decisions" on the subject of contributions from "individuals having no proprietary interest in the corporation"); S. Rep. No. 83-1622, at 18 (1954), reprinted in 1954 U.S.C.C.A.N. 4621, 4648 (same). While not explicitly listed, the legislative history most likely referred to several Supreme Court cases delineating the boundaries of capital contributions as distinguished from taxable income. Compare Brown Shoe Co. v. Comm'r, 339 U.S. 583, 591 (1950) (holding that payments to entice the location of a corporation's factories in certain communities were nontaxable

-15-

capital contributions), with Detroit Edison Co. v. Comm'r, 319 U.S. 98, 102-03 (1943) (holding that payments from an electric company's customers were not contributions to capital) and Texas & Pac. Ry. Co. v. United States, 286 U.S. 285, 289-90 (1932) (finding that government subsidies to guarantee a railroad a minimum revenue were not contributions to capital).

In 1960, the Internal Revenue Service ("I.R.S.") promulgated Treasury Regulation section 1.118-1, which notes that § 118(a) applies to capital contributions from both shareholders and nonshareholders.  The Regulation provides that "voluntary pro rata payments" to a corporation from its shareholders for the purposes of providing "additional funds for conducting [the corporation's] business . . . do not constitute income" to the corporation.  Treas. Reg. § 1.118-1. This Regulation is entitled to deference by this Court and is fatal to the petitioners' position.  See McNamee v. Dep't of Treasury, 488 F.3d 100, 106 (2d Cir. 2007) ("Because Congress has delegated to the Commissioner the power to promulgate all needful rules and regulations for the enforcement of [the Code], we must defer to his regulatory interpretations of the Code so long as they are reasonable." (internal quotation marks and citation omitted)); United States v. Mazza-Alaluf, 607 F. Supp. 2d 484, 496 (S.D.N.Y. 2009) ("Chevron deference

-16-

is warranted for Treasury regulations passed under the authority delegated to it by Congress.").

The petitioners' argument that capital contributions constitute "tax-exempt income," despite the traditional treatment of capital contributions as distinct from income, is centered on the relatively recent Gitlitz case. In Gitlitz, the petitioners were shareholders of an insolvent S corporation that realized a discharge of indebtedness. 531 U.S. at 210. The S corporation excluded the discharge of indebtedness amount from taxable income pursuant to 26 U.S.C. § 108(a)(1)(B) and (d)(7)(A), which excludes discharge of indebtedness from gross income if the taxpayer is insolvent. Id. The petitioners then increased their bases in the corporation's stock by their pro rata share of the discharge of indebtedness under the theory that it was an "item of income [including tax-exempt income]," to the corporation pursuant to § 1366(a)(1)(A). Id. The Commissioner contended that the Code's exclusion of discharge of indebtedness from the gross income of insolvent taxpayers meant that the discharge of indebtedness at issue was no longer an "item of income" for the purposes of § 1366(a)(1)(A) and could not be used to increase the petitioners' bases. Id. at 213.

The Supreme Court upheld the taxpayers' treatment of the discharge of indebtedness, holding that § 108(a)'s exclusion

of certain discharge of indebtedness income from gross income does not change its fundamental character as an "item of income."[7]  Id. at 214.  The Court noted that § 61(a)(12) explicitly provides that discharge of indebtedness generally is included in gross income.  Id. at 213.  The Court reasoned that while §§ 101 through 136 exclude certain items from gross income, the "mere exclusion of an amount from gross income does not imply that the amount ceases to be an item of income."  Id.  The Court also stated that "[i]f discharge of indebtedness of insolvent entities were not actually 'income,' there would be no need to provide an exception to its inclusion in gross income."  Id. at 214.

The petitioners argue that, based on the reasoning in Gitlitz, there would be no need to exclude capital contributions from gross income, as § 118(a) does, if capital contributions were not already included in gross income pursuant to § 61(a).  The petitioners argue that, therefore, capital contributions are fundamentally income and constitute

_____

[7] The Supreme Court acknowledged that the result of Gitlitz would be to allow shareholders a "double windfall":  The corporation's discharge of indebtedness income would be excluded and not passed through as taxable income and the shareholders would be able to increase their bases in stock.  Gitlitz, 531 U.S. at 219-20.  However, the Court found that the result was required by the "plain text" of the Code.  Id. at 220.  After Gitlitz was decided, Congress added language to § 108(d)(7)(A) barring the pass-through of excluded discharge of indebtedness income to the shareholders of S corporations and eliminating the resulting increase in basis:  "In the case of an S corporation, subsections (a), (b), (c), and (g) shall be applied at the corporate level, including by not taking into account under section 1366(a) any amount excluded under subsection (a) of this section."  Job Creation and Worker Assistance Act of 2002, Pub. L. No. 107-147, § 402(a), 116 Stat. 21, 40.

-18-

"items of income (including tax-exempt income)" for the purposes of § 1366(a)(1)(A). This argument ignores the critical difference between Gitlitz and this case: Gitlitz addressed payments that explicitly were included in gross income under § 61(a). See § 61(a)(12) ("[G]ross income means all income . . . including (but not limited to) . . . (12) [i]ncome from discharge of indebtedness . . . ."). While the petitioners are correct that the list of items of income in § 61(a) is not exclusive, the petitioners cannot rely on Gitlitz alone to overcome the long-standing treatment of capital contributions as distinct from income. Gitlitz did not create any new items of income. Gitlitz only held that the nature of discharge of indebtedness as income was not changed by the exclusion in § 108(a).

Unlike this case, the Commissioner in Gitlitz admitted that the item at issue—discharge of indebtedness—generally was included in gross income, but argued that the exclusion of discharge of indebtedness of insolvent entities in § 108(a) altered the character of that item. It was only in rejecting this argument that Gitlitz noted that it would be unnecessary to exclude discharge of indebtedness of insolvent entities from gross income if discharge of indebtedness in general were not already income. In this case, capital contributions traditionally have not been included in gross income in the

-19-

first instance and the fact that § 118(a) explicitly excludes them does not transform them into "items of income" for the purposes of § 1366(a)(1)(A).

The petitioners' view of the superfluous nature of § 118(a) is belied by the legislative history of that section. The legislative history of § 118(a) shows that, unlike discharge of indebtedness, Congress did not consider shareholder capital contributions to be generally includible in gross income when it created the exclusion. See State Farm Road Corp. v. Comm'r, 65 T.C. 217, 227 (1975) (noting that § 118 was "intended as an incorporation of existing decisional law"). As discussed above, § 118(a)'s exclusion of "any contribution to the capital of the taxpayer" (emphasis added) was intended to codify certain cases finding that nonshareholder, in addition to shareholder, capital contributions were not income. Treasury Regulation section 1.118-1 underscores this understanding of § 118(a) by explicitly stating that both shareholder and nonshareholder capital contributions "do not constitute income" to a corporation.

In addition to their argument based on Gitlitz and § 118, the petitioners argue that § 108(e)(6) demonstrates that capital contributions constitute income. Section 108(e)(6) provides a mechanism for taxing the discharge of any

-20-

indebtedness that was acquired by a corporation as a capital contribution.  Section 108(e)(6) provides that

> for purposes of determining income of the debtor
> from discharge of indebtedness, if a debtor
> corporation acquires its indebtedness from a
> shareholder as a contribution to capital—
> > (A) section 118 shall not apply, but
> > (B) such corporation shall be treated as having
> satisfied the indebtedness with an amount of money
> equal to the shareholder's adjusted basis in the
> indebtedness.

The petitioners argue that because § 108(e)(6) allows for discharge of indebtedness acquired as a capital contribution to be taxed as income to the corporation, capital contributions must be "items of income" for the purposes of § 1366(a)(1)(A).  However, discharge of indebtedness is explicitly included in gross income in § 61(a)(12) and, under Gitlitz, is an "item of income" for the purposes of § 1366(a)(1)(A) even when it is exempt from taxation.  The fact that Congress chose, when confronted with the confluence of discharge of indebtedness, which is income, and capital contributions, which traditionally have not been considered income, to subject discharge of indebtedness acquired as a capital contribution to taxation does not mean that capital contributions that are not discharge of indebtedness

-21-

constitute "items of income (including tax-exempt income)" for the purposes of § 1366(a)(1)(A).[8]

We are not aware of any case that has held that capital contributions are "income" under § 1366(a)(1)(A) or any other provision of the Code. On the contrary, the Supreme Court and this Court have repeatedly emphasized the distinction between capital and income. See, e.g., Macomber, 252 U.S. at 214-15; Cuba R.R., 268 U.S. at 632-33; Oregon-Washington, 251 F. at 213. The petitioners argue that Glenshaw Glass has overruled the earlier cases' treatment of capital as distinct from income because it rejected Macomber's definition of income as "'the gain derived from capital, from labor, or from both combined.'" Glenshaw Glass, 348 U.S. at 430-31 (quoting Macomber, 252 U.S. at 207). However, the decision in Glenshaw Glass was founded on "the intention of Congress to tax all gains except those specifically exempted." Glenshaw Glass, 348 U.S. at 430. In deciding that the punitive damages at issue in that case were a taxable gain, even though not derived from capital or labor, Glenshaw Glass did not overrule the previous cases' distinction between capital and income.

---

[8] The legislative history of § 108(e)(6) indicates that it was enacted to override the decision of the Court of Appeals for the Fifth Circuit in Putoma Corp. v. Commissioner, 601 F.2d 734, 751 (5th Cir. 1979), which held that a shareholder's discharge of indebtedness acquired by the corporation as a capital contribution was not taxable income to the corporation because it was a capital contribution. S. Rep. No. 96-1035, at 18-19, 56 n.24 (1980), reprinted in 1980 U.S.C.C.A.N. 7017, 7033-34, 7068 n.24.

On the contrary, Glenshaw Glass recognized that Macomber's definition of income was "useful" in that case precisely because it "distinguish[ed] gain from capital." Id. at 431. Capital contributions are not gains to a corporation. Rather, they "represent an additional price paid for[] the shares of stock held by the individual shareholders" of a corporation, and are treated as a part of the operating capital of the company. Treas. Reg. § 1.118-1.

In arguing that Glenshaw Glass erased the traditional distinction between capital contributions and income, the petitioners also rely on an I.R.S. General Counsel Memorandum dated December 21, 1977 (the "Memorandum"), which addressed whether certain nonshareholder contributions made to a public utility constituted excludable capital contributions under § 118(a) or constituted taxable income to the utility. The Memorandum concluded that because the contributions were motivated by the nonshareholder's desire to obtain a more reliable source of electric power, the amounts were taxable income, not contributions to capital. In providing a history of the taxation of nonshareholder capital contributions, the Memorandum noted that "the constitutional basis" of Cuba Railroad "seems to have been considerably weakened" by Glenshaw Glass and its progeny. I.R.S. Gen. Couns. Mem. 37,354 (Dec. 21, 1977) (citing State Farm Road Corp., 65 T.C.

at 227).  The Memorandum explained that payments like those made by the Cuban government to the railroad "can no longer be characterized as falling outside the scope of gross income within the meaning of Code § 61."  I.R.S. Gen. Couns. Mem. 37,354 (Dec. 21, 1977).  Rather, according to the Memorandum, those payments would be part of a "new class of tax-exempt transactions, called contributions to capital, that was codified in 1954 as Code § 118."  Id.

I.R.S. General Counsel Memoranda are informal documents written by the I.R.S. Chief Counsel's office.  They provide the Chief Counsel's opinion on particular tax matters before other I.R.S. officials.  The Memorandum at issue in this case includes a disclaimer that it is "not to be relied upon or otherwise cited as precedent by taxpayers."  Id.  As a result, the Memorandum is not entitled to deference under Chevron U.S.A. Inc. v. National Resources Defense Council, Inc., 467 U.S. 837 (1984), because it is an informal letter that itself renounces any force-of-law effect.[9]  See United States v. Mead

_____

[9] In Morganbesser v. United States, 984 F.2d 560, 563 (2d Cir. 1993) (quoting Herrmann v. E.W. Wylie Corp., 766 F. Supp. 800, 802-03 (D.N.D. 1991)), this Court noted that "[General Counsel Memoranda] are helpful in interpreting the Tax Code when 'faced with an almost total absence of case law.'"  The Court, therefore, found it "arguably permissible" to use General Counsel Memoranda ("GCMs") to "instruct the court on how the [I.R.S.] itself" defines "labor organization," because they were "the only real guidance as to what the [I.R.S.] considers a labor organization for the purposes" of the Code.  Id.  Courts of Appeals in other circuits have declined to rely on GCMs.  See Tupper v. United States, 134 F.3d 444, 448 & n.5 (1st Cir. 1998) ("GCMs . . . are not authority in this court.");  Stichting Pensioenfonds Voor de Gezondheid v. United States, 129 F.3d 195,

Corp., 533 U.S. 218, 226-27 (2001) (holding that <u>Chevron</u> deference is appropriate "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority"); <u>Christensen v. Harris County</u>, 529 U.S. 576, 587-88 (2000) (holding that agency interpretations contained in informal opinion letters are not entitled to <u>Chevron</u> deference). Any "respect" afforded to the Memorandum would only be proportional to its "power to persuade" pursuant to <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944). <u>Christensen</u>, 529 U.S. at 587.

In this case, we decline to rely on the Memorandum because it disclaims precedential effect and is not entitled to deference under <u>Chevron</u>. Furthermore, the persuasiveness of the Memorandum is limited in light of the fact that the Memorandum does not address the question whether capital contributions such as those in this case constitute "tax-exempt income" for the purposes of § 1366(a)(1)(A). The Memorandum, like <u>Cuba Railroad</u>, deals only with nonshareholder capital contributions, the scope of which has been clarified by several Supreme Court decisions following <u>Cuba Railroad</u>.

200 (D.C. Cir. 1997) ("These 'GCMs,' however, have no precedential value."); <u>Disabled Am. Veterans v. Comm'r</u>, 942 F.2d 309, 315 n.5 (6th Cir. 1991) ("Such informal, unpublished opinions of attorneys within the [I.R.S.] are of no precedential value . . . .").

See, e.g., Brown Shoe Co., 339 U.S. at 591-93; Detroit Edison Co., 319 U.S. at 103.

Finally, the petitioners point to two cases from Courts of Appeals in other circuits that allegedly show that capital contributions constitute income. In one case, the Court of Appeals for the Seventh Circuit referred to "tax-exempt capital contributions." Am. Med. Ass'n v. United States, 887 F.2d 760, 774 (7th Cir. 1989). In the other, the Court of Appeals for the Ninth Circuit addressed whether certain payments were "exempt from federal income tax as contributions to capital." Washington Athletic Club v. United States, 614 F.2d 670, 671 (9th Cir. 1980). The petitioners argue that because the above cases referred to capital contributions as being "exempt" from income, these cases demonstrate that capital contributions are "tax-exempt income" for the purposes of § 1366(a)(1)(A). However, these cases did not hold that capital contributions constitute income. Rather, they discussed, among other things, whether certain membership fees paid to associations constituted capital contributions or taxable income. The fact that these cases may have used imprecise language to express the fact that capital contributions are not subject to taxation does not mean that

capital contributions are income.[10]  In fact, American Medical Association explicitly recognized the distinction between capital contributions and income when it noted that if the plaintiff in that case argued that certain funds it received "should be likened to capital contributions, it would argue that those monies should never be considered income."  Am. Med. Ass'n, 887 F.2d at 774 n.15.

Therefore, for all of these reasons, we find that the petitioners' capital contributions do not constitute "items of income (including tax-exempt income)" under § 1366(a)(1)(A) and cannot be used to restore their bases in indebtedness pursuant to § 1367(b)(2)(B).

III

As an alternative to using their capital contributions to increase their loan bases and thereby reduce their taxable income, the petitioners argue that they should be allowed to deduct their capital contributions to G & D Farms as losses incurred in a transaction entered into for profit pursuant to § 165(c)(2).  The petitioners do not argue that their capital contributions to W & N California should be deductible.

---

[10] It is difficult to place too much emphasis on the specific language in those decisions.  In calculating taxable income, in most circumstances, there is no difference between the case where an item is included in gross income pursuant to § 61(a) and then excluded from gross income by another Code section and the case where the item is not includible under § 61(a) at all.

-27-

Section 165(c)(2) provides that individuals are allowed a deduction from taxable income for "losses incurred in any transaction entered into for profit, though not connected with a trade or business." In general, a negotiated payment to secure a release from conditional liability under a loan guarantee is deductible as a loss incurred in a transaction entered into for profit. See, e.g., Duke v. United States, No. 75 Civ. 5122, 1977 WL 1082, at *2 (S.D.N.Y. Jan. 31, 1977); Shea v. Comm'r, 36 T.C. 577, 582 (1961), aff'd, 327 F.2d 1002 (5th Cir. 1964); Lloyd-Smith v. Comm'r, 40 B.T.A. 214, 223 (1939), aff'd on other grounds, 116 F.2d 642 (2d Cir. 1941).

"This court has repeatedly held that, in determining the deductibility of a loss, the primary motive must be ascertained and given effect." Austin v. Comm'r, 298 F.2d 583, 584 (2d Cir. 1962); see also Helvering v. Nat'l Grocery Co., 304 U.S. 282, 289 n.5 (1938) ("[T]he deductibility of losses under [the predecessor of § 165(c)] may depend upon whether the taxpayer's motive in entering into the transaction was primarily profit."); Ewing v. Comm'r, 213 F.2d 438, 439 (2d Cir. 1954). The burden of proving the requisite motive is on the petitioners. Cf. Sutton v. Comm'r, 84 T.C. 210, 221 (1985), aff'd, 788 F.2d 695 (11th Cir. 1986).

Instead of looking to the "primary motive," some courts have attempted to ascertain whether the "sole purpose" of a taxpayer's payment was to secure a release from a loan guarantee before allowing the taxpayer to take a deduction pursuant to § 165(c)(2). See Duke, 1977 WL 1082, at *2; Shea, 36 T.C. at 582; Lloyd-Smith, 40 B.T.A. at 223. In Duke, the court denied the taxpayers' motion for summary judgment because it could not determine if their payment was for the "sole purpose" of securing a release from a guarantee or rather was the purchase price of a capital asset. Duke, 1977 WL 1082, at *2.

In this case, the Tax Court found that the petitioners "clearly had multiple purposes in making the[ir] capital contributions," and, therefore, distinguished this case from those that allowed deductions upon finding that payments were made for the "sole purpose" of obtaining releases from loan guarantees. Nathel, 131 T.C. at 274. The Tax Court noted that the parties stipulated that the Nathels made the contributions in connection with the banks' release of the petitioners' guarantees, in connection with Mr. Wishnatzki's assumption of responsibility as a guarantor, and to obtain Mr. Wishnatzki's agreement to the reorganization plan. Id. The Tax Court found that, therefore, the petitioners did not make the contributions for the "sole purpose of being released from

-29-

their guarantees on the bank loans" and, as a result, it found that the contributions were not deductible pursuant to § 165(c)(2).  Id. at 274-75.

To the extent the Tax Court required the capital contributions to be for the sole purpose of obtaining releases from the loan guarantees, the Tax Court required too much. The capital contributions need only have been made for the primary purpose of obtaining the releases in order to be deductible as losses incurred in a transaction entered into for profit.  However, the Tax Court's error was harmless because the petitioners did not meet their burden of showing that the primary purpose of the contributions was to obtain the releases from the guarantees.

The petitioners argue that the parties' stipulation before the Tax Court proves that the capital contributions were made for the primary purpose of obtaining the releases. The petitioners point to paragraph 26 of the stipulation, which provides that "[a]s a condition for releasing [the Nathels] from their guarantees of [G & D Farms'] debt, the Banks and [Mr. Wishnatzki] required [the Nathels] to each contribute to [G & D Farms] additional capital in the amount of $537,228.00."  (Stip. ¶ 26.)  The petitioners also rely on paragraph 34 of the stipulation, which provides that the Nathels' capital contributions to G & D Farms "were made

-30-

. . . to secure the release of their respective guarantees of [G & D Farms'] debts to the Banks and to obtain [Mr. Wishnatzki's] agreement to the release of the Nathels from their guarantees and to the reorganization plan."  (Stip. ¶ 34 (emphasis added).)

While paragraph 26 of the stipulation states that the capital contributions were a condition of the petitioners' release from their loan guarantees, there is no stipulation that the primary purpose of the contributions was to obtain that release.  Paragraph 34 of the stipulation provides that the capital contributions were made for three purposes:  (1) to secure the petitioners' release from the guarantees of G & D Farms' debts, (2) to obtain Mr. Wishnatzki's agreement to the release of the Nathels from the guarantees, and (3) to obtain Mr. Wishnatzki's agreement to the reorganization plan. The stipulation, therefore, suggests that the capital contributions were made to achieve multiple purposes, without indicating which, if any, was the primary purpose.

The petitioners point to several cases that demonstrate that payments can have multiple purposes and still be deductible under § 165(c)(2).  The petitioners argue that these cases show that the capital contributions here are deductible.  The petitioners read too much into these cases. In Rushing v. Comm'r, 58 T.C. 996, 1000-01, 1005 (1972), the

-31-

Tax Court distinguished between two payments the taxpayers attempted to deduct: legal expenses connected with the petitioners' personal guarantee of a corporation's debt, which the court found to be deductible, and other fees related to the sale of the corporation's assets, which it found to be not deductible. Rushing simply demonstrates that if a court can determine that the principal purpose of any one of a number of payments was in connection with a transaction entered into for profit, then the payment may be deducted pursuant to § 165(c)(2). In this case, it cannot be determined what portion of petitioners' capital contributions, if any, was principally made to obtain the petitioners' release from the guarantees.

The petitioners also point to a case from another circuit, Commissioner v. Condit, 333 F.2d 585, 587-88 (10th Cir. 1964), in which the court found that the taxpayer "attained three objectives" through making a certain payment, including obtaining a release on a loan guarantee, settling a debt with the payee, and transferring the responsibility for winding up a business. The court found that the taxpayer's payment "was not the payment of a debt within the purview of [26 U.S.C.] § 166(d) but rather a loss incurred in a transaction for profit." Id. at 588. To the extent that the court in Condit found that the payment had no primary purpose,

-32-

but nevertheless was deductible pursuant to § 165(c)(2), it is inconsistent with prior decisions of this Court and we decline to follow it.

In addition to relying on the parties' stipulations regarding the purposes of the capital contributions, the petitioners argue that the fact that G & D Farms and W & N New York "were sold for each corporation's fair market value" to Mr. Wishnatzki and the Nathels, respectively (Stip. ¶ 46), illustrates that the petitioners' capital contributions to G & D Farms could not have been part of the price the Nathels paid to obtain Mr. Wishnatzki's agreement to the sale of the companies. The petitioners argue that, therefore, the primary purpose of the capital contributions was to obtain the petitioners' release from the loan guarantees. However, there is no reason to believe that the petitioners' capital contributions were not part of the "fair market value" price for which the corporations were sold as part of the reorganization plan.

In their reply brief, the petitioners argue for the first time that their capital contributions were made in connection with a transaction entered into for profit because, as shareholders of both G & D Farms and W & N New York at the time, they signed their personal guarantees of G & D Farms' loans in order to improve the financial position of both

-33-

corporations, in light of the fact that W & N New York's business allegedly was dependent on receiving produce from G & D Farms. However, the Commissioner does not contest that the Nathels' personal guarantees of G & D Farms' loans constituted a transaction entered into for profit. The question is whether the primary purpose of the Nathels' subsequent capital contributions was to obtain releases from the loan guarantees. The fact that the Nathels expected the guarantees to benefit G & D Farms and W & N New York does not establish the primary purpose of the Nathels' capital contributions.

The petitioners did not meet their burden of showing that the capital contributions were primarily motivated by a desire to obtain releases from the loan guarantees. Therefore, the capital contributions are not deductible as losses incurred in a transaction entered into for profit pursuant to § 165(c)(2).

## CONCLUSION

For all of the reasons explained above, we **AFFIRM** the Tax Court's decision.