T.C. Memo. 2017-213

UNITED STATES TAX COURT

DANA D. MESSINA AND NANCY G. MESSINA, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

KYLE R. KIRKLAND AND STEPHANIE LAYNE, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 25510-15, 25567-15.　　　　Filed October 30, 2017.

As of the 2012 tax year, M and K together owned 80% of S1, an S
corporation, which owned Q, a qualified subchapter S subsidiary.  Q
was the borrower under a loan from an unrelated entity.  M and K
formed S2, a wholly owned S corporation, to acquire the loan.  M and
K contend that S2 should be disregarded for I.R.C. sec. 1366(d)(1)(B)
purposes and the loan deemed indebtedness of S1 to them, allowing
them to increase their bases in S1's indebtedness and take into
account its pass-through losses.  R maintains that S2's separate
corporate existence should be respected and the loan not be treated as
indebtedness of S1 to M and K.

Held:  S2 is not the incorporated pocketbook of M and K.

Held, <u>further</u>, S2 is neither an agent of M and K nor a conduit.

**[\*2]**    Held, further, M and K had made an actual economic outlay to S2, which in turn made an actual economic outlay to S1 and Q.

Held, further, the step transaction doctrine does not apply.

Held, further, M and K are bound by the form of their transaction. Newhall Unitrust v. Commissioner, 104 T.C. 236 (1995), aff'd, 105 F.3d 482 (9th Cir. 1997), followed.

Craig Alan Houghton, for petitioners.

Adam B. Landy, Audra M. Dineen, and Thomas R. Mackinson, for respondent.

## MEMORANDUM OPINION

LARO, Judge:  These cases arise out of respondent's adjustments to petitioners' returns for the 2012 tax year.  The cases were consolidated for trial, briefing, and opinion and were submitted fully stipulated under Rule 122.[1]

Respondent determined a $161,316 deficiency in Dana D. and Nancy G. Messina's Federal income tax for the 2012 tax year.  He also determined a

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) applicable for the relevant year.  Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] $182,096 deficiency in Kyle R. Kirkland and Stephanie Layne's Federal income tax for the same year.

The sole issue before this Court is whether respondent properly disallowed the deduction by petitioners of certain pass-through losses from Club One Acquisition Corp. (Club One), an S corporation 80% of which was owned by Messrs. Messina and Kirkland, by reducing their respective adjusted bases in indebtedness of the corporation to them. We hold that respondent's disallowance of petitioners' deduction of the pass-through losses is proper. By the parties' agreement, respondent's correlative adjustments are also upheld.

## Background

### I. Overview

The parties submitted these cases fully stipulated under Rule 122. The first stipulation of facts (and the facts drawn from stipulated exhibits) and the stipulation of settled issues are incorporated herein. Petitioners are residents of California. These cases are appealable to the Court of Appeals for the Ninth Circuit absent stipulation of the parties to the contrary.

### II. Club One's 2012 Tax Year

During the 2012 tax year Club One had an ordinary business loss of $1,425,709. Of this amount, $570,284 was passed through to each of Messrs.

[*4] Messina and Kirkland. Club One also had interest income of $1,135, of which $454 was passed through to each of Messrs. Messina and Kirkland. Club One reported $38,984 of deductible charitable contributions for the 2012 tax year, $15,594 of which was passed through to Mr. Messina and $15,593 of which was passed through to Mr. Kirkland.

III. Petitioners

Messrs. Messina and Kirkland first met as colleagues at Dabney Resnick & Wagner in 1993. Their first joint venture was the acquisition of the Selmer Co. They organized Kirkland Messina, Inc., a California corporation, on February 28, 1994, as an investment advisory firm that assisted clients with arranging leveraged buyouts and corporate financing. Before their venture with Club One out of which these cases arise, Messrs. Messina and Kirkland provided investment advisory services to the Bicycle Casino in Bell Gardens, California. Mr. Kirkland also provided investment advisory services to the Commerce Casino in Commerce, California, and the Vineyard Casino in Fowler, California.

A. Dana and Nancy Messina

Mr. Messina is a 1983 graduate of Tufts University with a degree in mechanical engineering and a 1987 graduate of Harvard Business School. Before attending Harvard Business School, Mr. Messina was employed as a nuclear

[*5] engineer for Combustion Engineering. He formerly held Series 7, Series 63, Series 24, and Series 27 securities licenses and was licensed in multiple State jurisdictions to initiate and handle securities transactions. He is also an owner of GLCR, Inc., d.b.a. Deuce Lounge and Casino, in Visalia, California.

Mr. and Mrs. Messina timely filed a joint Federal income tax return for the 2012 tax year. In preparing their return they used their adjusted basis in Club One stock and a $7,000,670 adjusted basis in Club One's indebtedness to them to claim deductions for the amounts of the losses, charitable contributions, and other items passed through to them from Club One for that tax year. Mr. and Mrs. Messina reported itemized deductions totaling $640,687 on Schedule A, Itemized Deductions, of their return. They also reported a foreign tax credit totaling $4,655 on Form 1116, Foreign Tax Credit, and a prior-year minimum tax credit totaling $29,431 on Form 8801, Credit for Prior Year Minimum Tax--Individuals, Estates, and Trusts, to their return. Respondent audited the return and issued a 30-day letter dated July 7, 2014, proposing certain adjustments thereto. Mr. and Mrs. Messina timely challenged the proposed adjustments with the Internal Revenue Service (IRS) Office of Appeals. The parties could not resolve the matter administratively, and respondent on July 8, 2015, issued a notice of deficiency.

**[*6]** In the notice of deficiency respondent reduced by $560,794 the amount of losses Mr. and Mrs. Messina could take into account for the 2012 tax year, thus increasing their taxable income by that amount. Respondent further determined that Mr. and Mrs. Messina's itemized deductions should be reduced by $26,551, $15,335 of which was attributable to a reduced charitable contribution deduction and $11,216 to reduced excess miscellaneous deductions. Respondent also determined that Mr. and Mrs. Messina no longer owe alternative minimum tax and are entitled to a $20,416 minimum tax credit. Accordingly, respondent determined a $161,316 deficiency in Mr. and Mrs. Messina's 2012 Federal income tax. The parties have stipulated that all but the first of the adjustments are correlative or computational and should be resolved by this Court's decision with respect to the first adjustment, which is the sole one at issue here.

Mr. and Mrs. Messina timely petitioned this Court for redetermination of the deficiency.

### B. Kyle Kirkland and Stephanie Layne

Mr. Kirkland graduated from Harvard College in 1984 and the Stanford Graduate School of Business in 1988. He formerly held Series 7, Series 63, Series 24, and Series 27 securities licenses and was licensed in multiple State jurisdictions to initiate and handle securities transactions. Mr. Kirkland is a board

[*7] member and president of the California Gaming Association, a trade organization representing licensed card rooms in the State of California. He is also an owner of GLCR, Inc., d.b.a. Deuce Lounge and Casino, in Visalia, California.

Mr. Kirkland and Ms. Layne timely filed a joint Federal income tax return for the 2012 tax year. In preparing their return, they used their adjusted basis in Club One stock and a $7,000,670 adjusted basis in Club One's indebtedness to them to claim deductions for the amounts of the losses, charitable contributions, and other items passed through to them from Club One for that tax year. Mr. Kirkland and Ms. Layne reported itemized deductions totaling $147,868 on Schedule A of their return. They also reported a foreign tax credit totaling $146 on Form 1116 attached to their return. Respondent audited the return and issued a 30-day letter dated September 25, 2014, proposing certain adjustments thereto. Mr. Kirkland and Ms. Layne timely challenged the proposed adjustments with the IRS Office of Appeals. The parties could not resolve the matter administratively, and respondent on July 8, 2015, issued a notice of deficiency.

In the notice of deficiency respondent reduced by $560,794 the amount of losses Mr. Kirkland and Ms. Layne could take into account for the 2012 tax year, thus increasing their taxable income by that amount. Respondent further

**[*8]** determined that Mr. Kirkland's and Ms. Layne's itemized deductions should be reduced by $15,682, of which $31 was attributable to a denied deduction for net medical and dental expenses, $15,335 to a reduced charitable contribution deduction, and $316 to denied excess miscellaneous deductions. Respondent also adjusted Mr. Kirkland's and Ms. Layne's alternative minimum tax and determined that their foreign tax credit should be increased from $146 to $524. Accordingly, respondent determined a $182,096 deficiency in Mr. Kirkland's and Ms. Layne's 2012 Federal income tax. The parties have stipulated that all but the first of the adjustments are correlative or computational and should be resolved by this Court's decision with respect to the first adjustment, which is the sole one at issue here.

Mr. Kirkland and Ms. Layne timely petitioned this Court for redetermination of the deficiency.

## IV. Acquisition of Club One Casino, Inc. (Casino)

### A. Casino

Casino is a California corporation which since 1995 and throughout 2012 has operated a card room in Fresno, California, licensed by the State of California. Before February 22, 2008, Casino was owned by George Sarantos and Elaine R. Long and taxed as an S corporation for Federal and State income tax purposes.

[*9]  B.    Club One

Club One is a California corporation organized on February 6, 2007.  Since its incorporation, it has elected to be taxed as an S corporation for Federal and State income tax purposes.  During February 2008 the following individuals acquired the listed numbers of shares of the issued and outstanding common stock of Club One, which they continued to hold during the 2012 tax year:

| Name | Number of shares | Ownership (percent) |
| --- | --- | --- |
| Dana D. Messina | 40,000 | 40 |
| Kyle R. Kirkland | 40,000 | 40 |
| George Sarantos | 17,000 | 17 |
| Haig Kelegian | 3,000 | 3 |

C.    Club One's Acquisition of Casino

On February 22, 2008, Club One acquired from Mr. Sarantos and Ms. Long 100% of the issued and outstanding stock of Casino.  This was accomplished by the merger of Club One Merger Sub, Inc. (Merger Sub), a California corporation and wholly owned subsidiary of Club One, into Casino pursuant to a February 24, 2007, stock purchase agreement between Club One as buyer and Mr. Sarantos and Ms. Long as sellers.  The agreement provided for aggregate consideration of $27 million, subject to certain purchase price adjustments.  Part of the consideration was to be paid in the form of two $2.5 million promissory notes issued by Merger

[*10] Sub, one to Mr. Sarantos and one to Ms. Long, each note bearing interest at the rate of 10% per annum and due seven years from the sale's closing date.

Upon Merger Sub's merger into Casino, Club One became the owner of 100% of Casino's issued and outstanding stock, and Casino became the obligor under both promissory notes. Immediately after the merger, having become a subsidiary of Club One, Casino made an election to be treated for Federal and State income tax purposes as the latter's qualified subchapter S subsidiary (QSub).

D. Financing the Acquisition

Club One's acquisition of Casino was funded in part by a loan of $21,856,435.37 from D.B. Zwirn Special Opportunities Fund, L.P. (D.B. Zwirn). The loan was evidenced by a financing agreement dated February 22, 2008, by and among Club One, Merger Sub, Casino, and D.B. Zwirn, the latter as agent for the lenders (at the time of the agreement's execution, D.B. Zwirn was also the sole lender). Under the agreement, the borrower was Merger Sub until its merger into Casino, whereupon Casino became the borrower.

The financing agreement required that accrued interest be paid monthly in arrears on the first day of each month and the principal be repaid in quarterly installments until February 22, 2012, when all amounts payable under the agreement were to become due immediately. As evidenced by a security

**[*11]** agreement and guaranty, each dated February 22, 2008, repayment of the D.B. Zwirn loan was secured by Casino's assets, a pledge of 100% of the stock of Casino, and the limited personal guaranties of Messrs. Messina and Kirkland.

Under the financing agreement, Mr. Sarantos and Ms. Long were required to execute a subordination agreement dated February 22, 2008, under which they subordinated their respective promissory notes to the D.B. Zwirn loan.

E.      State Approval of the Acquisition

California law requires the owner of a gambling enterprise to be licensed by the State. Cal. Bus. & Prof. Code secs. 19850 and 19851(a) (West 2016). An owner that is a corporation cannot be licensed unless "each officer, director, and shareholder, other than a holding or intermediary company, of the owner", individually applies for and obtains a State gambling license. Id. sec. 19852(a). The license should be obtained before engaging in a licensed gambling activity or occupying a position requiring licensure. Id. sec. 19855.

Messrs. Messina and Kirkland believed that Club One's acquisition of Casino required the approval of the California Gambling Control Commission (CGCC), an agency of the State of California with jurisdiction over the operation, concentration, and supervision of gambling establishments and over all persons having to do with the operations of gambling establishments within the State.

[*12] See id. sec. 19811. The CGCC on May 31, 2007, approved Club One's acquisition of Casino and on January 31, 2008, approved the issuance of gambling licenses to each of Messrs. Messina, Kirkland, Sarantos, and Kelegian.

Furthermore, Messrs. Messina and Kirkland believed that D.B. Zwirn's loan to Casino and Merger Sub's pledge of Casino stock to D.B. Zwirn as collateral thereto also required the CGCC's approval. It is unlawful in California to enter into an agreement with a licensee in connection with a licensed gambling operation except as allowed by CGCC regulations. Id. sec. 19901. Another statute provides that a purported sale, assignment, transfer, pledge, or other disposition of any security issued by a corporation holding a gambling license is void unless approved in advance by the CGCC. Id. sec. 19904. On July 26, 2007, and February 21, 2008, the CGCC approved D.B. Zwirn's loan to Merger Sub and Casino.

V. Postacquisition Events

A. The D.B. Zwirn Loan

On or about June 1, 2009, Fortress Investment Group, LLC (Fortress) replaced D.B. Zwirn & Co., L.P., as the manager of various funds and accounts, including among others D.B. Zwirn. In connection with this, D.B. Zwirn was converted into Fortress Value Recovery Funds I LLC (Fortress Fund).

[*13] During 2009 and 2010 Casino paid additional amounts to D.B. Zwirn and the Fortress Fund to remain in compliance with certain loan covenants set forth in the financing agreement. Casino hoped to reduce the principal balance of the loan to improve its ability to refinance it with a new loan at a lower rate of interest or a longer maturity.

### B. Refinancing the Loan

Beginning in 2010, at least 18 months before the D.B. Zwirn loan's February 22, 2012, maturity date, Messrs. Messina and Kirkland attempted to find investors or lenders who would either refinance or acquire the D.B. Zwirn loan from Fortress Fund before the loan matured. In early 2010 Mr. Messina contacted Global Hunter Securities, LLC (Global Hunter), to assist Casino and Messrs. Messina and Kirkland in finding such investors or lenders.

On January 28, 2010, Mr. Messina informed Fortress representative Clint Lofman by electronic mail, with copies to Fortress representative Bradley Brown and to Mr. Kirkland, that it appeared, on the basis of Casino's preliminary financial statements, that Casino would violate the earnings before interest, taxes, depreciation, and amortization (EBITDA) covenant in the financing agreement. On November 18, 2010, Mr. Lofman stated to Mr. Messina by electronic mail that he remained concerned about the EBITDA covenant violation.

[*14] On January 4, 2011, Messrs. Messina and Kirkland organized KMGI, Inc. (KMGI), a California corporation, to raise additional capital to either refinance or acquire the D.B. Zwirn loan from the Fortress Fund. Since its incorporation, KMGI has elected to be taxed as an S corporation for Federal and State income tax purposes. The entity was organized with the assistance of Robert S. Tabor, formerly of the Law Offices of Robert S. Tabor. Mr. Tabor in 2008 had served as California gaming law counsel to Club One and reviewed the financing agreement to ensure its compliance with State gaming laws. During 2011 and 2012 he served as KMGI's consultant on California gaming issues.

Because California law gives the CGCC power to approve or disapprove transactions involving gaming enterprises, see Cal. Bus. & Prof. Code sec. 19824(c) (West 2016), Messrs. Messina and Kirkland believed that KMGI could not acquire the D.B. Zwirn loan from the Fortress Fund or lend money to Casino without the CGCC's prior approval. In February 2011 Messrs. Messina and Kirkland, through Mr. Tabor, began discussions with the CGCC to obtain approval to use KMGI to refinance a portion of the D.B. Zwirn loan. And during August of 2011 KMGI, with Mr. Tabor as consultant, began the formal process of applying to the CGCC for approval to purchase some portion of the loan from the Fortress Fund. On September 2, 2011, Mr. Kirkland transferred $10,000 to KMGI

[*15] in exchange for 50% of its common stock. On September 22, 2011, the CGCC authorized KMGI to purchase $200,000 of the D.B. Zwirn loan from the Fortress Fund. On September 28, 2011, Mr. Kirkland lent $100,000 to KMGI. On that same day Mr. Messina transferred $110,000 to KMGI, $10,000 of which was used to acquire 50% of its common stock and $100,000 of which was a loan. KMGI recorded the transferred funds in its books and records as $20,000 of "capital stock" and $200,000 as "shareholder loans". The Fortress Fund, however, refused to sell the loan piecemeal, insisting that any sale must be of the entire loan. At the same time, despite their efforts, neither Global Hunter nor Messrs. Messina and Kirkland had been successful in finding an acceptable investor or lender who would refinance or acquire the loan.[2]

Before July 2011 neither Mr. Messina nor Mr. Kirkland had the personal liquidity to refinance or acquire the D.B. Zwirn loan from the Fortress Fund. During July 2011, however, Messrs. Messina and Kirkland each closed the sale of all the stock they held in Steinway Musical Instruments, Inc., pursuant to a stock transfer agreement they had entered into on April 29, 2011. This sale provided them with sufficient funds to acquire the loan from the Fortress Fund. Thus, their

---

[2]Although Diamond Creek Capital, LLC, expressed interest in acquiring the D.B. Zwirn loan from the Fortress Fund, the parties were unable to consummate the transaction due to disagreement about certain representations and warranties.

[*16] other efforts futile, Messrs. Messina and Kirkland each agreed to acquire 50% of KMGI's stock and lend it sufficient funds to purchase the D.B. Zwirn loan from the Fortress Fund. On October 14, 2011, Mr. Kirkland met with Kareem Benjamin and Jeff Slahor from the Fortress Fund at Fortress' office in Irving, Texas, to discuss the D.B. Zwirn loan's acquisition.

Messrs. Messina and Kirkland believed that if they lent funds directly to Casino to acquire the loan from the Fortress Fund, the loan would not be senior in priority to the promissory notes held by Mr. Sarantos and Ms. Long without their consent. Similarly, if they contributed funds to Club One intending that the funds be lent to Casino to repay the D.B. Zwirn loan in full, they would require Mr. Sarantos' and Mr. Kelegian's consent thereto. However, Messrs. Messina and Kirkland believed that if they lent money to KMGI to purchase and hold the D.B. Zwirn loan, repayment of the funds lent to KMGI would be senior to Mr. Sarantos' and Ms. Long's promissory notes, which remained subordinated to the note backing the D.B. Zwirn loan. Messrs. Messina and Kirkland understood that any of these three options would require the CGCC's prior approval. Before and during the 2012 tax year, neither of them had applied for or obtained authorization from the CGCC to lend money to Casino or acquire any of its indebtedness and

[*17] thus believed that they could not purchase the D.B. Zwirn loan from the Fortress Fund in their individual capacities.

Between September 2011 and April 2012 Messrs. Messina and Kirkland negotiated the purchase of the D.B. Zwirn loan from the Fortress Fund. Because KMGI was authorized by the CGCC to acquire $200,000 of the loan, to avoid delays Messrs. Messina and Kirkland caused KMGI to agree to purchase the entire loan from the Fortress Fund, subject to the CGCC's approval. On February 3, 2012, KMGI applied to the CGCC for approval to increase the amount of the loan it could purchase from $200,000 to the estimated entire unpaid principal amount that would be due under the loan as of the purchase date.

While the loan purchase negotiations were underway, the Fortress Fund on January 10, 2012, notified Casino that events of default under the financing agreement had occurred as a result of (1) the January 4, 2012, filing of a writ of execution by Mr. Sarantos and Ms. Long against Club One and the D.B. Zwirn collateral and (2) a November 14, 2011, notice of amended judgment filed by Mr. Sarantos and Ms. Long.[3] By letter dated January 10, 2012, the Fortress Fund notified (1) Casino and Club One to cease all payments to Mr. Sarantos and Ms.

---

[3]See infra for the background of Club One's dispute with Mr. Sarantos and Ms. Long out of which the amended judgment and writ of execution arose.

[*18] Long and (2) Mr. Sarantos and Ms. Long as subordinated creditors to immediately cease all attempts to (a) obtain funds or other assets from Casino or Club One or (b) enforce the writ of execution or amended judgment against Casino or Club One. The Fortress Fund demanded that this cessation continue until the D.B. Zwirn loan had been paid in full. By notice dated January 19, 2012, the Fortress Fund notified Casino that it was exercising its right to convert and increase the interest rate on the loan effective January 4, 2012. On February 7, 2012, the Fortress Fund notified Casino that certain payments to Club One were restricted and could no longer be made.

On February 22, 2012, the D.B. Zwirn loan's maturity date, all amounts payable under the financing agreement became immediately due and payable by Casino to the Fortress Fund. On February 23, 2012, the Fortress Fund notified Casino of an event of default, in that the loan's maturity date had passed, and demanded immediate payment of all amounts due. Also on February 23, 2012, the Fortress Fund advised Casino that its February 1, 2012, interest payment was deficient in the amount of $57,361.11 and demanded immediate payment thereof.

On March 8, 2012, the CGCC authorized KMGI to purchase the entire D.B. Zwirn loan from the Fortress Fund. On April 9, 2012, Mr. Kirkland transferred $7,150,000 and Mr. Messina transferred $7,300,000 to KMGI to provide it with a

**[\*19]** portion of the funds necessary to purchase the loan. On April 10, 2012, Mr. Kirkland transferred an additional $227,980.55 to KMGI. KMGI recorded these transferred funds in its books and records as "shareholder loans" as of the dates Messrs. Messina and Kirkland completed the transfers.

As of April 11, 2012, Casino owed the Fortress Fund $14,475,105.84 under the D.B. Zwirn loan. On April 11, 2012, KMGI paid that amount to the Fortress Fund by wire transfer to acquire the loan pursuant to a loan purchase agreement dated that same day. Thus KMGI on April 11, 2012, became the holder of the D.B. Zwirn loan. Immediately after its acquisition of the loan, KMGI on April 11, 2012, released Messrs. Messina and Kirkland from any and all obligations under their personal guaranties. On April 12, 2012, KMGI transferred $249,902.63 to Mr. Kirkland and $171,922.08 to Mr. Messina, for a total of $421,824.71, representing the amounts of their earlier transfers that were not used to fund the purchase of the D.B. Zwirn loan from the Fortress Fund.

On May 1, 2012, Casino paid $255,655.81 of principal due under the D.B. Zwirn loan to KMGI. On that same day KMGI transferred $127,407.90 each to Messrs. Messina and Kirkland, for a total of $254,815.80, as a payment on its shareholder loans. Also on May 1, 2012, KMGI separately transferred $800 to Mr. Kirkland to reimburse him for the California minimum tax that he had paid on

[*20] its behalf.  Upon the completion of all payments, KMGI's shareholder loans from Messrs. Messina and Kirkland had an unpaid principal balance of $14,001,340.04.  In preparing their 2012 Federal income tax returns, they treated their halves of this amount, or $7,000,670.02 each, as their respective bases in a liability of Club One owing to each of them and not as bases in KMGI.  On May 22, 2012, KMGI's bookkeeper posted an entry in the corporation's books and records reclassifying the entire $14,001,340.04 amount from "shareholder loans" to "additional paid in capital".  On December 14, 2012, Mr. Kirkland lent an additional $1,000 to KMGI, which the corporation recorded in its books and records as an additional "shareholder loan" from Mr. Kirkland as of that date.

Since its incorporation, KMGI has used a Los Angeles, California, address, the same address as used for Kirkland Messina, Inc.  From its incorporation until April 10, 2012, KMGI's sole asset was cash contributed or lent by Messrs. Messina and Kirkland to fund the purchase of the D.B. Zwirn loan from the Fortress Fund.  On and after April 11, 2012, KMGI's only assets (excluding funds received from Casino that were promptly paid or distributed to Messrs. Messina and Kirkland) were the D.B. Zwirn loan and a small amount of cash used to pay bank service charges and other nominal expenses.  In summary, after KMGI

[*21] became the holder of the D.B. Zwirn loan on April 11, 2012, it received the

following payments from Casino due under the loan during the 2012 tax year:

| Date of payment | Amount of payment | Obligation paid |
|---|---|---|
| 5/1/2012 | $255,655.81 | Principal |
| 6/1/2012 | 207,600 | Accrued interest and agency fee |
| 7/2/2012 | 66,000 | Accrued interest and agency fee |
| 12/12/2012 | 25,000 | Principal, accrued interest, and agency fee |

In turn, KMGI paid or distributed the following amounts to its shareholders:

| Date of payment or distribution | Amount of payment or distribution | Nature of payment or distribution | Amount paid or distributed to Messina | Amount paid or distributed to Kirkland |
|---|---|---|---|---|
| 4/12/2012 | $421,824.71 | Repayment of excess funds | $171,922.08 | $249,902.63 |
| 5/1/2012 | 254,815.80 | Repayment of shareholder loans | 127,407.90 | 127,407.90 |
| 6/1/2012 | 207,560 | Return of capital | 103,780 | 103,870 |
| 7/5/2012 | 65,960 | Return of capital | 32,980 | 32,980 |
| 12/12/2012 | 11,015 | Return of capital | 11,015 | --- |
| 12/14/2012 | 11,015 | Return of capital | --- | 11,015 |

[*22] In early 2015, Messrs. Messina and Kirkland applied to the CGCC for approval to acquire the D.B. Zwirn loan from KMGI. On December 10, 2015, the CGCC authorized an assignment of partial interests in the loan, allowing Messrs. Messina and Kirkland to purchase the D.B. Zwirn loan from KMGI.

C. Dispute with the Sellers

After Club One's acquisition of Casino, Club One discovered certain discrepancies in Casino's financial statements provided by Mr. Sarantos and Ms. Long before closing, along with several previously undisclosed operational and legal issues. Club One believed that these discrepancies and issues violated the sellers' representations and warranties made in connection with the stock purchase agreement. Consequently Club One requested a reduction in the Casino purchase price. Mr. Sarantos and Ms. Long rejected the proposed reduction and requested an increase in the purchase price, which Club One in turn rejected.

Club One and Mr. Sarantos and Ms. Long submitted their dispute to binding arbitration for resolution as required by the stock purchase agreement. On April 12, 2011, the arbitrator issued an interim award ruling against Club One, denying its proposed purchase price adjustment and granting the sellers' proposed adjustment. On June 27, 2011, the arbitrator issued an interim award granting attorney's fees and costs to Mr. Sarantos and Ms. Long. On that same day,

[*23] counsel for the sellers sent correspondence to Club One requesting immediate payment of the interim arbitration awards. On July 8, 2011, the arbitrator issued a final award incorporating the interim awards.

After oral notice and correspondence with Club One's controlling shareholders, the Fortress Fund sent a letter dated July 13, 2011, to Club One, Mr. Sarantos, and Ms. Long stating that, notwithstanding the arbitration award, the parties to the financing agreement remained subject to the subordination agreement executed by Mr. Sarantos and Ms. Long, and the arbitration award was subordinated indebtedness. The Fortress Fund emphasized that an order issued by the arbitrator to Club One or Casino to pay the award would constitute an event of default under the financing agreement, in which event no subordinated debt could be repaid, including any interest payments under the sellers' promissory notes. Accordingly, the Fortress Fund prohibited Club One and Casino from (1) paying the arbitration award of purchase price adjustments until there was no event of default continuing, or (2) paying the arbitration award of interest, attorney's fees, and other costs until all obligations under the financing agreement had been paid in full.

On September 26, 2011, Mr. Sarantos and Ms. Long obtained a judgment in the Fresno County Superior Court confirming the final arbitration award; the

[*24] judgment was amended on November 8, 2011. See Amended Judgment, Sarantos v. Club One Acquisition Corp., No. 11CECG02432 (Cal. Super. Ct. Nov. 8, 2011). On January 9, 2012, Club One filed an action in the Supreme Court of the State of New York for New York County, seeking to affirm that Mr. Sarantos' and Ms. Long's arbitration award judgment and promissory notes were subject to the subordination agreement. On October 21, 2014, that court ruled that while the promissory notes were subordinated, the arbitration award was not. See Post-Trial Decision and Order, Club One Acquisition Corp. v. Sarantos, No. 650049/2012 (N.Y. Sup. Ct. Oct. 21, 2014). On November 19, 2014, Club One and KMGI as intervenor appealed certain portions of the court's ruling to the Appellate Division of the New York Supreme Court.

On October 14, 2015, Club One and Casino separately filed a voluntary petition under chapter 11 of title 11 of the U.S. Code in the U.S. Bankruptcy Court for the Eastern District of California. The Casino bankruptcy petition listed Mr. Sarantos' and Ms. Long's promissory notes as disputed claims of $4,150,000. In January 2016 Club One, Casino, Mr. Sarantos, and Ms. Long reached a settlement regarding, among other things, the dispute surrounding the promissory notes. That same month, Club One and KMGI withdrew their appeal of the New York Supreme Court's ruling.

**[*25]** <u>Discussion</u>

I. <u>Overview</u>

The operative points of these cases can be summarized tersely as follows. As of the 2012 tax year, Messrs. Messina and Kirkland owned 80% of an S corporation, Club One, which in turn owned a QSub, Casino. The QSub was the borrower under the D.B. Zwirn loan. Messrs. Messina and Kirkland organized another S corporation, KMGI, of which they were the sole shareholders, to acquire the D.B. Zwirn loan. This was intended to make repayment of the loan to KMGI senior to Casino's repayment of the promissory notes to Mr. Sarantos and Ms. Long. Thus the indebtedness of Club One and its disregarded QSub, Casino, was held not directly by Messrs. Messina and Kirkland but indirectly through KMGI. Petitioners argue that KMGI should be disregarded and the D.B. Zwirn loan deemed to be indebtedness of Club One to Messrs. Messina and Kirkland. This would allow petitioners to count their adjusted bases in the loan in calculating the amounts of Club One's flow-through losses they can deduct for the 2012 tax year. Respondent urges this Court to conclude that KMGI's separate corporate existence should be respected and that the D.B. Zwirn loan should not be treated as indebtedness of Club One to Messrs. Messina and Kirkland. We agree with respondent.

[*26] II. <u>Legal Background</u>

Section 1366(a)(1) generally provides that an S corporation's shareholder takes into account, for his taxable year in which the corporation's taxable year ends, his pro rata share of the corporation's items of income, loss, deduction, or credit, as well as the corporation's non-separately computed income or loss. The character of the items passed through is preserved. Sec. 1366(b). However, the aggregate amount of losses and deductions taken into account by the shareholder is limited: It may not exceed the sum of the adjusted basis of the shareholder's stock in the S corporation and the shareholder's adjusted basis of any indebtedness of the S corporation to the shareholder. Sec. 1366(d)(1). Any disallowed loss or deduction is treated as incurred by the corporation in the succeeding taxable year with respect to that shareholder. Sec. 1366(d)(2)(A).

A QSub is a domestic corporation which (1) is not an ineligible corporation under section 1361(b)(2); (2) is owned 100% by an S corporation; and (3) elects to be treated as a QSub. Sec. 1361(b)(3)(B). Under section 1361(b)(3)(A) a QSub generally is not treated as a separate corporation, and all of its assets, liabilities, and items of income, deduction, and credit are treated as assets, liabilities, and such items of the S corporation. Thus for purposes of section 1366(d)(1)(B), a QSub's debt issued to its parent S corporation's shareholder is treated as the

**[\*27]** parent's debt to determine the amount of losses that may flow through to the parent's shareholders. H.R. Rept. No. 104-586, at 89 (1996), 1996-3 C.B. 331, 427.

The Code does not define "indebtedness of the S corporation to the shareholder" as used in section 1366(d)(1)(B). The legislative history of the statute's predecessor states that losses are limited "to the adjusted basis of the shareholder's investment in the corporation; that is, to the adjusted basis of the stock in the corporation owned by the shareholder and the adjusted basis of any indebtedness of the corporation to the shareholder." S. Rept. No. 85-1983 (1958), 1958-3 C.B. 922, 1141. This Court has construed "investment" in the section 1366(d)(1)(B) context to mean an actual economic outlay of the shareholder. See, e.g., Spencer v. Commissioner, 110 T.C. 62, 78-79 (1998) (citing Hitchins v. Commissioner, 103 T.C. 711, 715 (1994)). The shareholder bears the burden of establishing his basis in the indebtedness of the S corporation to him. Broz v. Commissioner, 137 T.C. 46, 60 (2011), aff'd, 727 F.3d 621 (6th Cir. 2013). In these cases, we need not address whether under section 7491(a) the burden of proof has shifted from petitioners to respondent because, first, petitioners have not so contended, and second, these cases having been submitted under Rule 122, there are no outstanding factual issues relevant to ascertaining petitioners' tax

[*28] liability--the only issues that remain are legal ones as to which the burden of proof is irrelevant.  See Petersen v. Commissioner, 148 T.C. ___, ___ (slip op. at 9) (June 13, 2017).

III.    Acquisition of Basis in Indebtedness of Club One

Respondent argues that a basis in an S corporation can be acquired either by contributing capital or directly lending funds to the company.  See Bergman v. United States, 174 F.3d 928, 931-932 (8th Cir. 1999).  The loan must be direct, respondent maintains, and thus no basis is created where funds are lent by a separate entity, even one closely related to the shareholder in question.  See id. at 932.  Respondent relies on this Court's caselaw for that proposition.  See Hitchins v. Commissioner, 103 T.C. at 715 ("[T]he indebtedness of the S corporation must run directly to the shareholders:  an indebtedness to an entity with passthrough characteristics which advanced the funds and is closely related to the taxpayer does not satisfy the statutory requirements."); Prashker v. Commissioner, 59 T.C. 172, 176 (1972) ("Clearly there must be a debt running directly to the shareholder in order to permit the deduction from income of a corporate net operating loss."); see also Frankel v. Commissioner, 61 T.C. 343 (1973), aff'd without published opinion, 506 F.2d 1051 (3d Cir. 1974); Thomas v. Commissioner, T.C. Memo. 2002-108, aff'd, 67 F. App'x 582 (11th Cir. 2003); Burnstein v. Commissioner,

[*29] T.C. Memo. 1984-74; Lee v. Commissioner, T.C. Memo. 1976-265, 35 T.C.M. (CCH) 1157 (1976). Respondent emphasizes that the D.B. Zwirn loan ran to Club One and Casino from KMGI, not from Messrs. Messina and Kirkland. According to respondent, all the evidence indicates that the debt does not run directly from the shareholders to Club One and Casino and so cannot be considered in computing the bases of any indebtedness of Club One to Messrs. Messina and Kirkland.

For their part, petitioners concede that this Court and others have interpreted section 1366(d)(1)(B) generally to require that indebtedness of an S corporation be owed directly to the shareholder. However, petitioners assert, form is but one-half of the inquiry, and the transaction's substance also needs to be considered. Thus petitioners posit that caselaw allows an intermediary such as KMGI to be disregarded where it (1) is acting as the taxpayer's incorporated pocketbook, (2) is a mere conduit or agent of the taxpayer, or (3) has failed to make an actual economic outlay to the loss S corporation that has made the intermediary poorer in a material sense as a result of the loan. Petitioners also argue that the step transaction doctrine should apply to determine the true creditor in the transaction for Federal income tax purposes. We address petitioners' theories in turn.

**[\*30]** A.   <u>Incorporated Pocketbook</u>

Petitioners urge that this Court find that KMGI acted as the incorporated pocketbook for Messrs. Messina and Kirkland in purchasing the D.B. Zwirn loan from the Fortress Fund and holding it thereafter.  Petitioners rely on a theory distilled from caselaw as summarized in <u>Broz v. Commissioner</u>, 137 T.C. at 62, that direct payments from a related entity to the taxpayer's S corporation constitute payments on the taxpayer's behalf where the taxpayer used the related entity as an "incorporated pocketbook."  <u>See</u> <u>Yates v. Commissioner</u>, T.C. Memo. 2001-280; <u>Culnen v. Commissioner</u>, T.C. Memo. 2000-139, <u>rev'd on other grounds</u>, 28 F. App'x 116 (3d Cir. 2002).  This Court has held that the term "incorporated pocketbook" refers to the taxpayer's habitual practice of having his wholly owned corporation pay money to third parties on his behalf and that whether an entity is an incorporated pocketbook is a question of fact.  <u>See</u> <u>Broz v. Commissioner</u>, 137 T.C. at 62 (citing <u>Ruckriegel v. Commissioner</u>, T.C. Memo. 2006-78).

While petitioners acknowledge that Messrs. Messina and Kirkland did not habitually use KMGI to pay their personal expenses or to pay Casino's expenses, they argue that this Court's caselaw suggests that habitual use of a corporate entity to make payments on an S corporation shareholder's behalf is not a requirement but merely evidence that indebtedness runs directly to the shareholder.  Petitioners

[*31] also emphasize that unlike the entities in Culnen or Yates, KMGI had no business activities other than holding the D.B. Zwirn loan and acting as a conduit for payments made by Casino.

Respondent, on the other hand, asserts that Messrs. Messina and Kirkland ought to be bound by the form of the transaction they have chosen. See Burnstein v. Commissioner, T.C. Memo. 1984-74, 47 T.C.M. (CCH) 1100, 1106 ("A transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred." (quoting Don E. Williams Co. v. Commissioner, 429 U.S. 569, 579-580 (1977))); see also Thomas v. Commissioner, T.C. Memo. 2002-108, 2002 WL 799871, at *6 ("Ordinarily, taxpayers are bound by the form of the transaction they have chosen; taxpayers may not in hindsight recast the transaction as one that they might have made in order to obtain tax advantages." (quoting Harris v. United States, 902 F.2d 439, 443 (5th Cir. 1990))), aff'd without published opinion, 67 F. App'x 582 (11th Cir. 2003). Moreover, respondent points out, where the entities involved in transactions are owned wholly by the taxpayer, that taxpayer bears "a heavy burden of demonstrating that the substance of the transactions differs from their form." Ruckriegel v. Commissioner, T.C. Memo. 2006-78, 2006 WL 1007628, at *8 (citing Bergman, 174 F.3d at 933).

**[\*32]** Respondent also argues that the "incorporated pocketbook" cases cited by petitioners, <u>Culnen</u> and <u>Yates</u>, do not apply here.  First, respondent maintains, that line of cases deals with frequent and habitual payments made on behalf of the taxpayer by the related entity, often for personal expenses.  Second, he contends, those cases involved back-to-back loans, where a related entity lends or distributes assets to the taxpayers, followed by a loan from the taxpayer to the S corporation.  There, this Court found that the payments were not in substance direct loans from the related entity to the S corporation with the taxpayer serving as a mere conduit from the transfer of funds.  Here, respondent asserts, there was a one-time transfer from each of Messrs. Messina and Kirkland to KMGI, followed by a single payment to acquire the D.B. Zwirn loan, all of this being insufficient to demonstrate a habitual practice of the entity paying on its owners' behalf.

We agree with respondent.  The "incorporated pocketbook" rationale is inapposite here.  In both of the cases petitioners cite--<u>Culnen</u> and <u>Yates</u>--the taxpayers sought to regularly direct funds from one of their entities through themselves and on to an S corporation.  Here, petitioners concede that Messrs. Messina and Kirkland did not use KMGI habitually to pay Casino's or their personal expenses.  Instead, they argue that this is not a requirement but only evidence of indebtedness running directly to the shareholder.  To the extent we

[*33] would agree with that statement, the fact that KMGI did not make payments habitually does not help petitioners' case. To the contrary, it would be evidence against a finding that indebtedness runs from Club One and Casino directly to Messrs. Messina and Kirkland. At any rate, we disagree with petitioners' interpretation of Culnen and Yates. Frequent and habitual payments are key to a finding that a corporation served as an incorporated pocketbook. KMGI did not make frequent and habitual payments on behalf of its shareholders. Accordingly, we find that it did not function as Messrs. Messina and Kirkland's incorporated pocketbook.

B.  Conduit or Agent

Petitioners cite Commissioner v. Bollinger, 485 U.S. 340 (1988), for the proposition that corporations, when serving as agents of taxpayers, may be ignored for tax purposes. In Bollinger the taxpayers formed two corporations to secure financing at higher rates than allowed by State usury laws. Under a nominee agreement, the corporations held title to real property as the taxpayers' agents for the sole purpose of securing financing and had no assets, liabilities, employees, or bank accounts. Commissioner v. Bollinger, 485 U.S. at 342-344. The real property's operation over several tax years generated income and losses, which were reported by the taxpayers on their tax returns. Id. The Supreme Court held

[*34] that the corporations were agents of the taxpayers, who in turn were entitled to claim the real property income and losses directly. The Supreme Court determined that to reach such a result, the agent-principal relationship must be genuine, as evidenced by (1) a written agreement setting forth the fact that a corporation is acting as agent for its shareholders with respect to a particular asset, (2) the corporation's functioning as agent and not principal with respect to the asset for all purposes, and (3) the corporation's holding itself out as the agent and not principal in all dealings with third parties relating to the asset. Id. at 349-350.

Petitioners point out that in Lee v. Commissioner, 35 T.C.M. (CCH) at 1159 n.3, this Court suggested that in a true conduit or agency situation, such as with a nominee, a loan running through a corporate intermediary may be considered to run directly from the shareholder instead for purposes of the predecessor to section 1366(d)(1)(B). Petitioners argue that their cases involve facts similar to those in Bollinger and that this Court's suggestion in Lee should be brought to bear here. Petitioners emphasize that Messrs. Messina and Kirkland contributed to KMGI, which had no assets or other business activity besides the loan acquisition, all the funds necessary to purchase the D.B. Zwirn loan and that KMGI served effectively as a conduit for payments from Casino. Petitioners also contend that Messrs. Messina and Kirkland advised the parties involved in the loan acquisition that

[*35] KMGI was purchasing the loan on behalf of Messrs. Messina and Kirkland and that doing so allowed the CGCC to grant its approval to the transaction more quickly than if the two owners had applied to CGCC in their individual capacities. Petitioners thus would have us hold that KMGI acted as agent for Messrs. Messina and Kirkland in purchasing the D.B. Zwirn loan from the Fortress Fund.

Respondent retorts that this Court in past cases, such as in Hitchins or Burnstein or Thomas, has been reluctant to apply the agency exception to the rule that indebtedness must run directly from the S corporation to its shareholder. Moreover, respondent argues, Club One, Casino, KMGI, and Messrs. Messina and Kirkland were sophisticated parties who consulted with their counsel and advisers before undertaking the D.B. Zwirn loan purchase from the Fortress Fund. Respondent points out that they consciously chose the form of the transaction to maintain the D.B. Zwirn loan's seniority with respect to other Casino obligations. Respondent asserts that the record does not indicate that the CGCC or any other third party was aware of KMGI's being an agent for Messrs. Messina and Kirkland, nor was any agency agreement executed; the corporate minutes of Club One and KMGI do not reflect any agency relationship. Respondent also emphasizes that Messrs. Messina and Kirkland were released from their individual guaranties of the D.B. Zwirn loan upon KMGI's acquisition thereof. Finally,

[*36] respondent believes that the record shows that KMGI conducted itself as a principal in its interactions with the CGCC, Fortress, and other parties.

We agree with respondent that KMGI did not act as agent of Messrs. Messina and Kirkland. The Supreme Court has set forth several factors to consider when evaluating whether a corporation is another's agent: (1) whether it operates in the name and for the account of the principal, (2) whether it binds the principal by its actions, (3) whether it transmits money received to the principal, (4) whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal, (5) whether its relations with the principal depend upon the principal's ownership of it, and (6) whether its business purpose is the carrying on of an agent's normal duties. Nat'l Carbide Corp. v. Commissioner, 336 U.S. 422, 437 (1949). In Commissioner v. Bollinger, 485 U.S. at 349-350, the Supreme Court found it sufficient to establish the existence of agency that: (7) there was a written agreement setting forth that a corporation was acting as agent for its shareholders with respect to a particular asset, (8) it functioned as agent and not principal with respect to the asset for all purposes, and (9) it was held out as agent and not principal in all dealings with third parties relating to the asset. This Court has held that the nine indicia put forward in Nat'l Carbide and Bollinger are not dispositive requirements for agency status but rather

**[*37]** factors leading to the conclusion that that status exists in a given case. See

Barnhart Ranch Co. v. Commissioner, T.C. Memo. 2016-170, at *23.

In reviewing the Nat'l Carbide and Bollinger indicia, we conclude that no

agency relationship existed between KMGI and Messrs. Messina and Kirkland.

We examine each of the nine factors in turn. First, the record demonstrates that

KMGI, while owned by Messrs. Messina and Kirkland, operated in its own name

and for its own account. For instance, it stood on its own in its dealings with the

CGCC and was the sole purchaser of the D.B. Zwirn loan from the Fortress Fund.

KMGI had its own bank accounts and held shareholders and directors meetings.

In short, it was very much a separate entity. This factor does not favor petitioners.

Second, petitioners have presented no evidence of any instance where

KMGI bound Messrs. Messina and Kirkland by its actions. Indeed, on acquiring

the D.B. Zwirn loan, KMGI in its role as counterparty immediately released its

shareholders from their personal guaranties of the loan, thus unbinding them from

any personal responsibility therefor. This factor does not favor petitioners.

Third, while KMGI did promptly transmit to Messrs. Messina and Kirkland

substantially all the funds received in relation to the D.B. Zwirn loan, it was under

no legal or contractual obligation to do so. This factor is neutral for petitioners, at

best favoring them weakly.

**[*38]** Fourth, KMGI's income was attributable to an asset that it held, the D.B. Zwirn loan. The income was attributable to neither Messrs. Messina and Kirkland's services, nor assets belonging to them. This factor does not favor petitioners.

Fifth, KMGI's relations with Messrs. Messina and Kirkland depended on their ownership thereof. Their contribution to KMGI of the funds necessary to acquire the D.B. Zwirn loan initially was classified by KMGI on its schedule of shareholder loans as a "Loan from Shareholders" and later treated as "Additional Paid in Capital"; similarly the payments from KMGI to Messrs. Messina and Kirkland were classified on the corporation's cashflow statement as "Repayment of Shareholder Loan" and subsequently as "Return of Capital (Distribution of Income)". Thus the financial flows between KMGI and Messrs. Messina and Kirkland were as those between a corporation and its lenders or shareholders, not as between an agent and its principal. This factor does not favor petitioners.

Sixth, KMGI's business purpose was to hold the D.B. Zwirn loan and maintain the related note's seniority to Mr. Sarantos' and Ms. Long's promissory notes. KMGI did not have a business purpose of carrying on an agent's normal duties. This factor does not favor petitioners.

[*39] Seventh, there is no evidence of any agreement, written, oral, or implied, establishing KMGI as an agent for Messrs. Messina and Kirkland.  This factor does not favor petitioners.

Eighth, KMGI acted as principal in relation to the D.B. Zwirn loan.  For instance, it was the sole purchaser of the asset from the Fortress Fund and alone received all payments due under the terms of that loan.  No other person, not even Mr. Messina or Mr. Kirkland, had any legal or contractual right to or interest in the asset.  This factor does not favor petitioners.

And ninth, KMGI was not held out as an agent of Messrs. Messina and Kirkland in its dealings with third parties.  There is nothing in the record to suggest otherwise.[4]  While it may have been known to others that KMGI was

---

[4]Petitioners make much of a part of Mr. Sarantos' January 16, 2013, deposition testimony in the course of the New York State court proceeding where he alluded to his belief that it was Messrs. Messina and Kirkland, not KMGI, who purchased the loan from the Fortress Fund:

> Q.  You're aware that sometime in the spring of 2012 KMGI purchased the loan from Fortress, are you not, sir?
>
> A.  You mean Kirkland and Messina, don't you?
>
> Q.  No.  I said KMGI.
>
> A.  I know what you said, but it's Kirkland and Messina.

(continued...)

[*40] funded, owned, and controlled by Messrs. Messina and Kirkland, funding, ownership, or control is insufficient to establish an agency relationship; else, every closely held entity and subsidiary would be considered its owner's or parent's agent, an absurd result. Indeed, Messrs. Messina and Kirkland had every incentive to place as much separation between themselves and KMGI as they could for purposes of the arbitration between Club One and Mr. Sarantos and Ms. Long and the subsequent action in New York State court. This factor does not favor petitioners.

Petitioners have at most established the existence of one of the nine Nat'l Carbide and Bollinger indicia with respect to KMGI's relationship with Messrs. Messina and Kirkland. This is inadequate to persuade us that this relationship was

---

[4](...continued)
Q. So, in your view, the corporate form doesn't matter?

A. I would imagine it's going to come into play.

Q. When you incorporated George Sarantos, Inc., did you expect that folks would understand that they're dealing with a corporation rather than you personally?

*     *     *     *     *     *     *

A. Anybody that dealt with GS Management got George Sarantos.

This deposition testimony, however, does not address whether KMGI was held out as the agent of Messrs. Messina and Kirkland.

[*41] that of an agent to its principals. The weight of the factors instead shows KMGI to be a distinct corporate entity. Accordingly, we find that KMGI was not Messrs. Messina and Kirkland's agent, nor was it a conduit.

C. Actual Economic Outlay

Petitioners argue that KMGI--similarly to the taxpayers in cases such as Bergman and Oren v. Commissioner, 357 F.3d 854 (8th Cir. 2004), aff'g T.C. Memo. 2002-172, where the Court of Appeals for the Eighth Circuit determined that to increase his basis in an S corporation the stockholder must make an actual economic outlay and be left poorer in a material sense--made no actual economic outlay to purchase the D.B. Zwirn loan. Rather, petitioners maintain, it was Messrs. Messina and Kirkland who provided the funds used by KMGI to purchase the loan. Petitioners emphasize that Messrs. Messina and Kirkland fully owned and controlled KMGI and were released from their guaranties of the loan upon its acquisition by the corporation. Moreover, they assert, KMGI was a shell corporation with no business or other activity besides holding the D.B. Zwirn loan, and the corporation's net worth both before and after the loan's acquisition was approximately $20,000, the amount of Mr. Messina's and Mr. Kirkland's initial capital contributions. Petitioners add that KMGI functioned as a conduit for payments received from Casino, retaining only nominal amounts to pay bank

[*42] charges and other de minimis expenses. Consequently, petitioners urge that we find that KMGI made no actual economic outlay in purchasing the D.B. Zwirn loan on behalf of its shareholders and that it was not poorer in a material sense afterwards because all the funds used to purchase the loan had been lent to it by Messrs. Messina and Kirkland.

Respondent argues that Messrs. Messina and Kirkland each made an actual economic outlay and contribution to KMGI and that the amounts they contributed to KMGI were reclassified from shareholder loans to additional paid-in capital, which increased their bases in the stock of KMGI. See Nathel v. Commissioner, 131 T.C. 262, 267 (2008) ("Generally, a shareholder in an S corporation has a tax basis in his stock equal to the amount of the contributions he makes to the capital of the S corporation, and the shareholder's capital contributions are not included in the income of the S corporation."), aff'd, 615 F.3d 83 (2d Cir. 2010). Thus, respondent maintains, the amounts contributed to KMGI by Messrs. Messina and Kirkland, minus any repayments of shareholder loans before May 22, 2012, when the $14,001,340.04 of outstanding shareholder loans was reclassified by KMGI's bookkeeper to additional paid-in capital, were capital contributions. See id. at 271. Respondent points out that this reclassification is borne out by the journal entries in KMGI's general ledger and KMGI's 2012 Federal income tax return.

[*43] Accordingly, respondent contends that we should hold that Mr. Messina and Mr. Kirkland made capital contributions to KMGI, thereby increasing their stock bases in that corporation, and thus cannot use the same contribution dollars to increase their debt bases in Club One.

Respondent also disputes petitioners' characterization of KMGI as a shell corporation, arguing that Messrs. Messina and Kirkland had a significant business purpose in structuring the transaction as they did: the maintenance of the D.B. Zwirn loan's seniority to Mr. Sarantos' and Ms. Long's promissory notes.

We agree with respondent that Messrs. Messina and Kirkland did make actual economic outlays, see, e.g., Thomas v. Commissioner, T.C. Memo. 2002-108, 2002 WL 799871, at *6, and that these outlays were to KMGI. Petitioners, by their argument about actual economic outlay, essentially rehash the conclusion of their other two theories that KMGI was nothing more than a conduit or incorporated pocketbook that ought to be disregarded. We have already disposed of those theories. KMGI was a corporation with its own separate existence. Likewise it was not simply a shell corporation but a distinct entity with at least one substantial asset, the D.B. Zwirn loan, and a significant business purpose. Cf. Ashdown v. Commissioner, T.C. Memo. 1989-40, 56 T.C.M. (CCH) 1160, 1161 n.5 (1989) ("Neither party defined the term shell corporation although each of

[*44] them used it. We assume it means a corporation which has no assets or has assets of very little value although it appears to be prosperous and successful on paper."). And the reclassification, from shareholder loans to additional paid-in capital, of Mr. Messina's and Mr. Kirkland's contributions of funds to KMGI in its books and records is further evidence as to the transaction's substance. Mr. Messina's and Mr. Kirkland's capital contributions, combined with KMGI's other indicia of actual corporate existence, are compelling evidence of economic outlay.

Taxpayers generally are bound to the form of the transaction they have chosen. See Newhall Unitrust v. Commissioner, 104 T.C. 236, 243 (1995) ("[I]t is well established that taxpayers are ordinarily bound by the form of their transaction while the government can attack that form if it does not represent the substance of the transaction."), aff'd, 105 F.3d 482 (9th Cir. 1997); see also, e.g., CMI Int'l, Inc. v. Commissioner, 113 T.C. 1, 4 (1999) ("Generally, taxpayers are bound to the form of their transaction."). Petitioners have failed to establish that Messrs. Messina and Kirkland should not be held to the form of the transaction they deliberately chose. Therefore, any economic outlays by Messrs. Messina and Kirkland are fairly considered to have been made to KMGI, a distinct corporate entity, which in turn made an economic outlay to Club One and Casino.

**[*45]** D.   <u>Step Transaction Doctrine</u>

Petitioners also argue that we should apply the step transaction doctrine, <u>see</u> <u>Commissioner v. Court Holding Co.</u>, 324 U.S. 331, 334 (1945), to hold that Messrs. Messina and Kirkland and not KMGI became the new holders of the D.B. Zwirn loan after its purchase from the Fortress Fund.  Petitioners look to <u>Packard</u> <u>v. Commissioner</u>, 85 T.C. 397 (1985), as an instance of this Court's reliance on the step transaction doctrine to ignore the formation, sale, and liquidation of an S corporation.  In support of their position, they assert that KMGI's only substantial asset had been and was the D.B. Zwirn loan, that KMGI was a conduit, and that it released Messrs. Messina and Kirkland from their personal guaranties of the loan, something that a third-party purchaser of the loan would not have done.

Respondent disputes petitioners' application of the step transaction doctrine to these cases, arguing that Messrs. Messina and Kirkland consciously and intentionally chose the form of the transaction and should not be able to argue against their own form to achieve a more favorable tax result.  Respondent adds that KMGI was not an agent of or a mere conduit for Messrs. Messina and Kirkland.  Thus, respondent argues, the form and the substance of the D.B. Zwirn loan acquisition are the same, and the step transaction doctrine should not apply.

**[\*46]** We agree with respondent. Petitioners' step transaction doctrine argument is yet another permutation of their other theories, of which we have disposed. KMGI was not Messrs. Messina and Kirkland's incorporated pocketbook, nor was it their agent or a conduit. Each had made an actual economic outlay to KMGI, and they intended that the corporation be respected as an entity distinct and separate from them. There is no ambiguity in their intent, nor is there ambivalence in Messrs. Messina and Kirkland's care to organize and maintain KMGI as a discrete body corporate. Cf. Estate of Leavitt v. Commissioner, 875 F.2d 420, 423-424 (4th Cir. 1989), aff'g 90 T.C. 206 (1988).

Long has the rule been recognized by the courts that taxpayers are bound by the form of their transaction and may not argue that the substance triggers different tax consequences. Id. at 423; see also Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974) ("This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not[.]"). While taxpayers might at first blush plead inequity that they may not attack the form of their transactions while the Government can do so, see Newhall Unitrust v. Commissioner, 104 T.C. at 243 ("[I]t is well established that taxpayers are ordinarily bound by the form of their

[*47] transaction while the <u>government</u> can attack that form if it does not represent the substance of the transaction."), such an argument is doomed to fail. Taxpayers have the benefit of forethought and strategic planning in structuring their transactions, <u>Helvering v. Gregory</u>, 69 F.2d 809, 810 (2d Cir. 1934) ("Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes."), <u>aff'd</u>, 293 U.S. 465 (1935), whereas the Government can only retrospectively enforce its revenue laws.

Although the step transaction doctrine is not a "one-way ratchet" and taxpayers in certain instances may benefit from it too, <u>Falconwood Corp. v. United States</u>, 422 F.3d 1339, 1352 n.6 (Fed. Cir. 2005); <u>see also</u> <u>MAS One Ltd. P'ship v. United States</u>, 271 F. Supp. 2d 1061, 1067 (S.D. Ohio 2003) ("Indeed, the step transaction doctrine is not merely a method preventing tax avoidance, but can also be used for a taxpayer's benefit."); <u>Sooner Fed. Sav. & Loan Ass'n</u>, 4 Cl. Ct. 746, 753 (1984) ("That the step transaction rule cuts both ways has been generally assumed and decided."), petitioners' cases do not present such an instance.

Indeed, petitioners misconstrue the step transaction doctrine, perhaps confusing it with broader substance-over-form principles, of which the step transaction doctrine is but one part. <u>See, e.g.</u>, <u>CNT Investors, LLC v.</u>

**[*48]** Commissioner, 144 T.C. 161, 193 n.33 (2015) ("We have described the step transaction doctrine, for example, as simply an extension or application of the 'substance over form' doctrine."); Penrod v. Commissioner, 88 T.C. 1415, 1428 (1987) ("The step transaction doctrine is in effect another rule of substance over form[.]"). Under the step transaction doctrine "interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction." Commissioner v. Clark, 489 U.S. 726, 738 (1989). The acquisition of the D.B. Zwirn loan consisted of only two steps: Mr. Messina's and Mr. Kirkland's transfers of funds to KMGI and the latter's purchase of the loan from the Fortress Fund. KMGI did not go on to resell the loan to Messrs. Messina and Kirkland or any other entity. Therefore, there was no step the consolidation of which with the other steps would allow the D.B. Zwirn loan to be treated as running directly from Messrs. Messina and Kirkland to Club One and Casino. Accordingly, we find that petitioners may not invoke the step transaction doctrine to hold that Messrs. Messina and Kirkland and not KMGI became the holders of the D.B. Zwirn after its acquisition from the Fortress Fund.

IV.   Conclusion

We have found that KMGI was not Messrs. Messina and Kirkland's incorporated pocketbook, nor was it their conduit or agent. Messrs. Messina and

[*49] Kirkland had made actual economic outlays to KMGI, which in turn made an actual economic outlay to Club One and Casino. And the step transaction doctrine does not apply to cause KMGI to be disregarded in Messrs. Messina and Kirkland's transactional arrangement. Accordingly, we hold that the form of the D.B. Zwirn loan's acquisition corresponds to its substance and should be respected for Federal tax purposes as it was implemented. Petitioners have not carried their burden of establishing that Mr. Messina's and Mr. Kirkland's bases in Club One's indebtedness to them were other than those determined by respondent. By the parties' stipulation, respondent's correlative adjustments also are upheld.

We have considered all of the parties' arguments, and to the extent not discussed above, conclude that those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decisions will be entered for</u>

<u>respondent</u>.